SMITH *v.* MAXEY.

1. TRUSTS—DEEDS—PURCHASER IN GOOD FAITH—CONSIDERATION—
AGENCY.

  One who in good faith and for a valuable consideration
  purchases lands from an agent or trustee, in whose name
  title vested, in ignorance of any trust or obligation rest-
  ing upon the grantor, as for example not to make a con-
  veyance until he paid the principal in the transaction
  an agreed consideration, will be protected in his pur-
  chase. He is entitled to rely on the apparent authority
  with which the agent is vested.

2. PRINCIPAL AND AGENT—AUTHORITY—TRUSTEE.

  Third parties are entitled to deal with an agent in pur-
  suance of the apparent authority with which he is vested
  by his principal, irrespective of any secret limitations
  and restrictions of which they may be ignorant; the
  mutual rights and liabilities depend upon the apparent
  scope of the agent's authority.

3. TRUSTS—CONSTRUCTIVE TRUST—AGENCY.

  Upon testimony tending to show that defendant under-
  took to organize a lumber corporation which would erect
  a mill and lumber plant on certain lands, which complain-
  ant had conveyed by absolute deed to his agent, a third
  party, though upon express restrictions as to payment of
  the price to the owner; that having found a buyer defend-
  ant secured a conveyance from the agent to buyer pur-
  porting to be a gift from complainant, who, in fact, had
  not so authorized; that defendant secured the payment
  of $9,000 from the last grantee to himself, *held*, in a
  suit to impress a trust upon the proceeds of the property,
  that complainant's action in placing the title in his
  agent's name, giving the latter apparent authority to
  convey the lands, estopped him from questioning the right
  of defendant to the fund: evidence also *held*, to show
  want of notice to defendant or his customer of a land
  contract existing between the principal and agent where-
  by the sum of $10,000 was to be paid to the complainant
  before transferring title to a third party.

4. SAME—FOLLOWING TRUST FUND.

  A *bona fide* purchaser of land from a trustee or agent

without notice of any trust or restrictions upon the agent's authority takes the property free from any obligation to account to the principal or beneficiary.

5. Same—Consideration.

A valuable consideration, in a legal sense, may consist in some right, interest, profit or benefit accruing to one party or some forbearance, loss, or responsibility given, suffered or undertaken by the other: it may be other than the actual payment of money and may consist of acts to be done after the conveyance.

6. Evidence—Parol Evidence Rule—Consideration.

Parol evidence is admissible to show the actual consideration of a deed which contained a recital that it was for one dollar.[1]

Appeal from Wayne; Murphy, J. Submitted October 7, 1914. (Docket No. 12.) Decided June 7, 1915. Rehearing denied October 29, 1915.

Bill by Samuel L. Smith against John O. Maxey for an accounting. From a decree for complainant, defendant appeals. Reversed.

*J. O. Murfin,* for complainant.

*Joseph J. O'Connor* (*William P. Belden,* of counsel), for defendant.

STEERE, J. Complainant filed this bill in the circuit court for the county of Wayne, in chancery, praying for an accounting by defendant as a trustee *ex maleficio;* the primary purpose of said bill being to impress a trust in behalf of complainant upon the sum of $9,000 claimed to be in possession of defendant as the proceeds of a sale of certain land, title to which is charged to have been obtained from complainant without compensation, through fraud, misrepresentation, and betrayal of trust. Avoiding mat-

---

[1] The question of parol evidence as to consideration of a deed is fully discussed in notes in 20 L. R. A. 101, 25 L. R. A. (N. S.) 1194; see, also, note in 68 L. R. A. 928.

ters most seriously in controversy, and following closely the well-sustained findings of fact painstakingly extracted from this voluminous record by the learned chancellor who heard the case, a general history of the events leading up to this litigation, essential to an understanding of the issues, is as follows:

Before and at the time of the transactions in question defendant was a resident of the village of L'Anse, in Baraga county, and complainant resided in the city of Detroit. Complainant held in his name, both in individual capacity and as trustee for others, title to various parcels of land in and around L'Anse, the management of which was intrusted to one William L. Mason, an attorney residing and practicing in said village. Complainant had held the lands for many years, and, prior to its care being intrusted to William L. Mason, the latter's father had acted in the same capacity for complainant in affairs connected with his land holdings in that part of the country.

Amongst other activities, defendant had interested himself in timber lands in the vicinity of L'Anse, and during the winter of 1910-11 held under option several thousand acres with a view to purchasing and lumbering them. In connection with others he proposed and planned to organize a company to take over these lands and erect a mill in the village of L'Anse to manufacture into lumber the logs cut therefrom. To that end he and his associates organized, on March 16, 1911, the L'Anse Bay Lumber Company. Preliminary to and in connection with the project, public interest was aroused, and meetings of citizens were held in the town hall of L'Anse looking to public support and co-operation in promoting and financing the same, at which the advantages to that locality from the erection and operation of a mill were presented and urged; the matter

being a subject of general discussion in that community. At some of these meetings, and at other times and places, William L. Mason stated that the interests which he represented in the village would donate a site for such a mill as was proposed. The details of those representations are somewhat in dispute, but it is clearly shown that such overtures and assertions were generally and freely made by Mason.

Upon February 6, 1911, while this matter was rife, and at a time when Mason was confined to his home by illness, defendant, accompanied by two gentlemen who expected with others to be subscribers for stock in the proposed company, and by their attorney, called upon Mr. Mason and discussed the project, at which conference he clearly stated to them that the Smith interests, so called, were ready to and would, through him, donate a site proposed for the mill located on the bay shore, known as lot 3, section 5, town 50 N., range 33 W. Whatever uncertainties had previously existed as to his overtures, he there distinctly told these parties that in his proposal to furnish a mill site for the company, which they intended to form, he represented and was acting for complainant. Defendant and his associates (including Mason himself) thereafter proceeded with their promotion, assuming that Mason had authority to make and carry this offer into execution. Mason, however, never paid his stock subscription and afterwards dropped out of the company.

It is the contention of complainant that in making such representations and proposals Mason acted absolutely without authority. At the time of these transactions he was prominent in local matters, in good standing, and had the confidence of both complainant and the community in which he resided, and was at first active in promoting the L'Anse Bay Lumber Company, although, before trial of this suit, fol-

lowing disclosures of a serious nature, he disappeared from L'Anse under a cloud, concealing his whereabouts, if alive, and his testimony could not, therefore, be obtained. It developed, also, that he had continuously grossly misrepresented the situation as to the mill site project to complainant, who was in Detroit, leading him to believe that it was proposed to purchase the site for the sum of $10,000, the price complainant wanted for it.

Some time in the summer of 1911 a tentative agreement was entered into between complainant and Mason, who had proposed to himself purchase on contract numerous descriptions of complainant's property in that locality, including lot 3, for $60,000, of which $10,000 was to be paid down and time given for the balance—lot 3 to be released from the contract and conveyed as soon as the first payment of $10,000 was made. This lot was claimed to be the most desirable and suitable site for the proposed industry near the village, though defendant and his associates contended that independent of the interests of the village others equally good were available. A form of land contract embodying the terms of their agreement, prepared in duplicate and executed by complainant, was sent from Detroit to the National Bank of L'Anse by complainant's Detroit attorney, accompanied by a letter of instruction to the bank, dated September 6, 1911, directing that, when Mason signed the same and paid $10,000 thereon, one copy should be delivered to him and the other returned to Smith with the payment. Mason failed to perform on his part, and the papers remained in possession of the bank until the spring of 1913. Defendant was president of said bank.

While this matter was still under negotiation, Mason went to Detroit, near the 1st of September, 1911, and had a conference with complainant and his

two sons on the subject, urging the desirability of a deed to himself of said lot 3 being put in his hands, that he might have it available at any time, to close a sale then pending, should a consummation be reached. As the result of this interview and a series of letters between Mason and complainant, in which Mason emphasized the progress and anticipated benefits of the mill project, and pending deals with the "mill people," complainant executed and delivered to Mason a full-covenant warranty deed of said lot 3, with a stated consideration therein of $1, and in return, as stipulated, Mason, on September 22, 1911, gave complainant a written agreement obligating himself neither to convey the property nor record said deed to him until his note to Smith for $10,000 had been paid, as provided for in the prior land contract to him, at the same time also giving complainant said note, payable within 20 days after September 22, 1911, which note was later renewed but never paid. The testimony abundantly shows that during all these transactions, and almost until the time Mason disappeared from L'Anse, Smith believed that $10,000 would be paid for lot 3 before Mason parted with the title.

Having thus obtained a deed of the property to himself, Mason, in direct violation of his trust and of the written conditions under which he held the deed, proceeded forthwith to carry out the assurances which he had made to the promoters of the L'Anse Bay Lumber Company, and on September 30, 1911, deeded to defendant Maxey said lot 3, for the stated consideration of $1, no actual consideration then passing; complainant's deed to Mason and Mason's deed to defendant being recorded, on October 21, 1911, in the office of the register of deeds of Baraga county.

The promotion and financing of the L'Anse Bay

Lumber Company was not as successful as had been hoped, and defendant devoted considerable time during the winter of 1911-12 to visiting different localities in an effort to interest capital in it. Finally, early in 1912, he attracted to the project Marshall Butters, of Chicago, who, with various associates, consented to investigate a proposition to purchase outright the assets of the L'Anse Bay Lumber Company, previously organized. Negotiations to that end were brought to a close May 22, 1912, by the acceptance of certain propositions, the details of which need not here be given, followed by some trouble and delay in the adjustment of various details, among which was the amount claimed by defendant and others for promoting the L'Anse Bay Lumber Company, a greater amount for this being asked than the Marshall Butters people were willing to allow; but the deal was finally closed August 10, 1912. Among the property so purchased and conveyed to the Marshall Butters Lumber Company, the organization formed to take over the enterprise, was the lot 3 in question. Maxey did not deed this to the L'Anse Bay Lumber Company until July 24, 1912, and the L'Anse Bay Lumber Company conveyed it to the Marshall Butters Lumber Company upon the same day; both deeds being recorded on July 30, 1912, and the consideration in each deed being $9,000. For this the Marshall Butters Lumber Company paid $9,000 by a check to "T. D. Tracy, Treas. of L'Anse Bay Lumber Co." (and cashier of defendant's bank), who paid the same to Maxey, and this is the money upon which it is sought to impose the trust in behalf of complainant.

It is not claimed that Maxey was a direct trustee of Smith, or that any primary fiduciary relations existed between them; but it is claimed that by reason of Mason's agency, or trusteeship, the transac-

tion, considered in its entirety, stamped by operation of law a resulting (or, more properly, constructive) trust on the ultimate proceeds of the sale of this lot ' by Maxey, a third party to whom it was conveyed by Mason in violation of his trust, so that Smith,. Mason's *cestui que trust*, could follow and claim such proceeds. Counsel for complainant plant his suit on the following propositions quoted from 2 Pomeroy's Eq. Jurisprudence (2d Ed.), § 1048:

"Wherever property, real or personal, which is already impressed with * * * a trust of any kind, express or by operation of law, is conveyed or transferred by the trustee, not in the course of executing and carrying into effect the terms of express trust, or devolves from a trustee to a third person, who is a mere volunteer, or who is a purchaser with actual or constructive notice of the trust, then the rule is universal that such heir, devisee, successor, or voluntary transferee, or such purchaser with notice, acquires and holds the property subject to the same trust which before existed, and becomes himself a trustee for the original beneficiary. * * * It is not necessary that such transferee or purchaser should be guilty of positive fraud or actually intend a violation of the trust obligation. It is sufficient that he acquires property upon which a trust is in fact impressed, and that he is not a *bona fide* purchaser for a valuable consideration and without notice."

The concluding qualification in the above statement of the well-settled rule upon which complainant relies is thus more fully elaborated in 39 Cyc. p. 559:

"The right to follow trust property in the hands of a third person, and impress the trust thereon, ceases when the property comes into the hands of one who stands in the position of a *bona fide* purchaser for value without notice, as where the legal title to the property comes into the hands of one who acquires it for a valuable consideration without notice of its trust character, including a purchaser without notice from a purchaser with notice."

Unquestionably this case turns on whether or not it appears that Maxey took title to this property without notice of its trust character, as between Mason and Smith, and for a valuable consideration. Complainant claims that Maxey knew, or should have known, the real status of the lot when he took his deed from Mason, that he paid no consideration therefor and realized from it $9,000, for which, as a constructive trustee, he should account. Maxey claims that the valuable consideration which he promised and performed was securing the contemplated industry to locate at L'Anse; that Mason tendered him a deed for a site, showing a good title from Smith, as he had often asserted he could and would, and Maxey accepted the same without suspicion, in good faith, proceeding thereupon to perform on his part, ultimately deeding the lot to the company he promoted, which sold it, with all its other assets, to the company which built the mill; and that the L'Anse Bay Lumber Company paid him the $9,000 for time devoted to and expenses incurred in its interest.

It is undisputed that no confidential relations existed between Maxey and Smith. They lived the length of the State apart and were not in touch with each other. Smith testified he did not know Maxey, and did not believe he ever saw him. The magnitude of Mason's perfidy and breach of trust with Smith could have no bearing, unless known to Maxey; and, if unknown, Maxey's questionable conduct in getting from the Butters Company and absorbing this money by a subterfuge, which is urged and emphasized by complainant, and by which the trial court was apparently largely influenced, cannot operate to attach a constructive trust to what he realized from that source. Evidently each of them was deceived by and acting upon Mason's misrepresentations to him.

Smith was led to believe that the lumber company, or Mason for it, would pay him $10,000 for the lot; and Maxey, that Smith, or the Smith people, through Mason, would contribute the lot in consideration of the resultant benefits to his or their other holdings in that locality by reason of the proposed industry. Complainant owned practically all the unoccupied land in L'Anse and near 1,000 acres close by.

As it ultimately developed, the initial mischief in this case was done by Smith executing and delivering to his agent, Mason, a full-covenant warranty deed of this property, on its face conveying absolute title, thus apparently clothing him with unlimited ownership and control, and the right to dispose of it, at any time to any one for whatever consideration he chose, only limiting his authority by separate, private written instructions, of which there is not a scintilla of evidence that Maxey or any other person in L'Anse had any knowledge whatever. Had Smith sent his deed to the bank, to be delivered to Mason on payment of what he demanded, as he previously did the land contract, it would have been just as available for Mason to show the "mill people" he could deliver a good title when they were ready to perform, if his representations to Smith were true; yet, though he apparently trusted in and believed Mason and sent him the deed direct, taking Mason's note for the purchase price, with a private promise not to use the deed until the note was paid, he now urges that Maxey should not have believed Mason and was not deceived by him, although fortified by the convincing muniments of title with which he had equipped him. Smith did in law pass a legal title to Mason.

"It is a well-settled rule of law that, if the grantor does not intend that his deed shall take effect until some condition is performed, *or the happening of some future event;* he should either keep it himself, or

leave it with some other person as an *escrow* to be delivered at the proper time. That it should operate as an *escrow* it is necessary that the delivery should be made to a stranger, and not to the party; for if one makes a deed and delivers it to the party, to whom it is made as an *escrow,* upon certain conditions, in such case, let the form of the words be whatever it may, the delivery is absolute, and the deed shall take effect presently." *Dawson* v. *Hall,* 2 Mich. 390.

Mason and Maxey, though acquainted and fellow townsmen, and both working in common with other citizens of that village to secure the industry, were not intimate, nor scarcely on friendly terms. They were opposed politically and rivals in other ways, were not in each other's confidence, and Maxey had even expressed some doubts as to the value of Mason's assurances that he could get a deed of this lot as he had proposed, though it is the testimony of various witnesses that it was the general talk and common understanding that he would furnish a deed, just as he apparently did. His own law partner testified in part as follows:

"*Q.* Did you ever hear Mason say upon what terms this site was to be given?

"*A.* Yes; the site was to be given for the erection of a sawmill that would employ 30 or 40 men. It was to be given away in consideration of Mr. Maxey bringing a mill into town. Such terms were made by Mr. Mason a great many times. We talked this over ourselves and with others very often from the time that the first letter was written until after the mill was erected."

After the L'Anse Bay Lumber Company was organized, with many small stockholders in the village, the people of Baraga, a neighboring village on L'Anse bay, offered a site as an inducement for the company to locate there, and meetings were held at L'Anse to discuss the subject. Of one of these meetings, at

186 Mich.—11.

which Mason was present, a witness named Sicotte testifies:

"The talk was principally about the site, and Mr. Mason again said that a site would be donated, and that he would get busy at once and see that the deed was here in about a week or ten days, if I remember right. Mr. Mason said it would be without any cost to the people or the L'Anse Bay Lumber Company. At that meeting there was general talk about the plant, but the main object was to find out what Mason would do regarding the site. Every business man at L'Anse felt that something had to be done, and done quick."

It was not long after this that Mason delivered the deeds to Maxey, enjoining him to "go out and make good." This court has quoted with approval, in *Marx* v. *King*, 162 Mich. 258 (127 N. W. 341), the following from 31 Cyc. p. 1331, which appears particularly pertinent to the facts involved here:

"While as between the principal and the agent the scope of the latter's authority is that authority which is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third persons ignorant thereof; and as between the principal and third persons the mutual rights and liabilities are governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing, or which he has permitted the agent to represent that he possesses, and which the principal is estopped to deny. The apparent authority so far as third persons are concerned is the real authority, and when a third person has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority."

It is contended in behalf of complainant that the land contract from Smith to Mason, sent by Smith's attorney to the Bank of L'Anse, of which Tracy, treasurer of the L'Anse Bay Lumber Company, was

cashier and Maxey president and principal owner, furnished such information of the situation as to put Maxey on inquiry, and therefore amounted to such notice as to preclude him from successfully interposing the claim of an innocent purchaser in good faith. Maxey denies knowledge of this contract; but, assuming that he did know, we are unable to give it the inferential force for which complainant contends. Had he read the contract and instructions to the bank, he would have learned that upon payment by Mason of $10,000 and signing the duplicates the bank was directed to deliver to him one copy and return the other with the payment; that the contract was for a sale of numerous descriptions of the Smith lands, including lot 3, to Mason for $60,000, one-sixth to be paid down and the remaining $50,000 on time. Nothing was indicated as to the price or value of any particular description. Lot 3, which Mason had promised for the mill site, was to be deeded, at his election, at any time after the payment was made and contract delivered. This contract was executed September 22, 1911, and subsequently sent from Detroit to the bank in L'Anse, where it remained. Mason's deed to Maxey is dated September 30, 1911. Just when it was delivered to Maxey is not shown, but it was recorded October 21, 1911. Maxey had no knowledge that Smith had asked or placed any special price or value on this particular lot 3, and did know that Smith's agent had freely and publicly asserted it would be given for a mill site in consideration of stimulated market and increased values which would result to Smith's other holdings, from the contemplated industry. If Smith was anxious for the sale to go through, the industry would make it more probable Mason could perform on his part; if he failed, Smith would yet retain his lands, and the benefits from the new industry would result to him. Mason

was Smith's agent, and apparently in his confidence. Maxey was not. We see nothing in a knowledge of the unperformed contract which would or should lead Maxey to suspect, when Mason confronted him with and delivered to him a perfect title to lot 3, with the injunction to make good, as Mason had, that Mason was defrauding his principal and violating some secret trust.

Maxey testified that he never saw or knew of the contract, and there is no direct testimony of any witness to the contrary. What is proposed with that evidence is to build up inference on inference—to infer from the fact that the contract was sent for delivery to the bank of which he was president that he knew of it, and from the inferred fact that he knew of it that he read it, and from the inferred fact he read it that he knew, or ought to have known, that Smith's full-covenant warranty deed to Mason was not what it purported to be, and the latter was perpetrating a fraud in deeding the lot to him in violation of a secret trust duty he owed to Smith. We are unable to conclude that complainant has shown defendant knew, or ought to have known, that the apparent authority conferred upon Mason by the deed to him was not what it purported to be.

It is contended that complainant never received a cent for this property from any one, and therefore Maxey's deed is void, and no protection to him for want of valuable consideration. There were no dealings, nor contractual relations, between them. Maxey, as a third party, dealt with Mason on the apparent authority with which his principal had clothed him. Mason, as agent for complainant and in charge of his extensive land holdings in that locality, named the consideration and made the offer. He said to Maxey and others that he and those he represented "figured," if they could secure such an industry at

L'Anse, it would increase the value of their lands near by, and ultimately "the cost wouldn't amount to anything of giving this land, as they would receive increased value for the balance of their property." Of certain testimony which defendant was seeking to introduced on this subject at the hearing, complainant's counsel. said:

"If the object of this testimony is simply to prove that the incoming of a substantial mill would benefit Mr. Smith's holdings, we will concede upon this record that we hoped and expected that it would."

The evidence that Maxey was the leading spirit and devoted much time and effort to this promotion, finally securing the industry as stipulated by Mason, is not controverted. A witness named Seavoy testified:

"The Marshall Butters Lumber Company this spring (1913) started operating their mill on the lot in controversy; they broke ground for that mill in September, 1912."

"A 'valuable consideration,' in a legal sense, may consist either in some right, interest, profit, or benefit accruing to one party, or some forbearance, loss, or responsibility given, suffered, or undertaken by the other." Words and Phrases, vol. 2, p. 1445.

There can be no question of the rule that extraneous and parol evidence is admissible to show the actual consideration for a conveyance of land independent of the amount or thing stated in the deed by which title passes. In *Stanley* v. *Schwalby*, 162 U. S. 255, 16 Sup. Ct. 754, a similar question to that raised here was thus settled in an opinion written by Justice Gray:

"A valuable consideration may be other than the actual payment of money, and may consist of acts to be done after the conveyance. *Prewitt* v. *Wilson*, 103 U. S. 22; *Hintz* v. *Metropolitan Bank*, 111 U. S. 722, 727 [4 Sup. Ct. 613]; 4 Kent Com. 463; Dart, Vend-

ors (6th Ed.), 1018, 1019. The advantage inuring to the city of San Antonio from the establishment of the military headquarters there was clearly a valuable consideration for the deed of the city to the United States."

We think it undisputed that by the terms of the agreement between Mason and defendant the conveyance was made for a valuable consideration, and that the stipulated terms were fully observed and performed by the grantee. For the foregoing reasons, we are led to conclude that no constructive trust, as contended for, is shown to have arisen between defendant and complainant.

The decree is therefore reversed, and complainant's bill dismissed, with costs to defendant.

BROOKE, C. J., and McALVAY, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.