STOTTS v. STOTTS.

1. HUSBAND AND WIFE—ASSIGNMENT OF CONTRACT—FRAUD—ANTENUPTIAL ASSIGNMENTS.

 A prospective husband does not commit a fraud upon his intended wife by the assignment, one day before his marriage, of his interest in a land contract to one of his daughters, so as to render the assignment void as to her, because depriving her of rights of homestead and dower,

especially where the assignment was intended to relieve the assignor of what had become, because of his financial condition, an onerous obligation.[1]

2. EVIDENCE—LEASES—CONSIDERATION—NOMINAL CONSIDERATION.
The real consideration of a lease, the consideration of which is stated as being one dollar, may be shown, if material.[2]

3. HOMESTEADS—CHARACTER—INTENT.
A homestead right is an artificial estate in land for the protection of the family in possession of it as a home, and its character as such depends upon both possession and the actual intention of the parties, and, while the owners may live elsewhere temporarily, and, intending to return, retain their homestead rights, it is largely a matter of continuing intent, and is a fact to be proved like any other fact.

4. SAME—ABANDONMENT—CONSENT OF WIFE—PRESUMPTIONS.
If a homesteader removes with his family the consent of his wife will be presumed.

5. SAME—ABANDONMENT—EVIDENCE.
Evidence *held*, to show an abandonment by a husband and wife of homestead rights in property occupied as a homestead.[3]

6. HUSBAND AND WIFE—HOMESTEADS—ASSIGNMENTS.
A wife is not deprived of her homestead rights by the assignment of a life lease in a homestead, in which she does not join.

7. SAME—HOMESTEADS—ESTOPPEL—LACHES.
A husband and wife are estopped by their conduct and by laches from asserting homestead rights in a life lease of land bought under contract, where they abandon the property for 12 years and only make claim to it when the contract has been paid up by one daughter to whom the father had assigned the contract and by another daughter and her husband, and the father had been more than compensated by what his older daughters did in raising and educating one of his children.

---

[2] On parol evidence as to consideration of a deed, see notes in 20 L. R. A. 101; 25 L. R. A. (N. S.) 1194.

[1] On conveyance of property in contemplation of marriage, but before negotiations for marriage have begun, as a fraud on the subsequent husband or wife, see note in 9 L. R. A. (N. S.) 955.

[3] As to effect of abandonment of homestead by parent on rights of children, see note in 56 L. R. A. 80.

Appeal from Wayne; Van Zile, J.   Submitted June 8, 1917.   (Docket No. 26.)   Decided December 27, 1917.

Bill by George E. Stotts and another against Elizabeth Stotts and another to quiet title to land and for an accounting.   From a decree ·dismissing the bill, plaintiffs appeal.   Affirmed.

*William C. Gottman* and *Charles C. Stewart*, for plaintiffs.

*Anderson, Wilcox & Lacy*, for defendants.

STEERE, J.   Defendants Elizabeth Stotts and Alberta Stotts Auringer are daughters of plaintiff George E. Stotts.   He and plaintiff Sarah Stotts, his second wife and their stepmother, filed this bill to recover the title to and possession of a house and lot in the city of Detroit known as 1287 Wabash avenue, appraised by real estate men at approximately $2,300 or $2,400.   In· 1913 and 1914, it was valued for taxation at $1,220 as shown by the assessment records for those years.   The legal description of the premises is:   .

"Lot No. six hundred and twenty-two (622) situated on the west side of Wabash avenue according to a plat of Godfroy farm p. c. 726 lying north of Grand River avenue, recorded in the office of the register of deeds in Wayne county," etc.

Stotts first bought the vacant lot in 1890 for $575 under a land contract from the then owner, A. L. Hall, a real estate dealer who was represented in the transaction by John Wynne acting as his agent.   He then made a payment of $250, having recently sold a lot in Canada for about that amount.   The following year he made arrangements through Wynne to borrow from Hall $1,060 for the purpose of building a house on the lot.   A new land contract dated May 14, 1891, includ-

ing that amount, was then substituted for the former one, the total consideration being $1,385, payable at the rate of $20 per month with interest on deferred payments. Stotts thereafter occupied this property with his first wife and their family until she died, on January 17, 1901. When they moved upon the premises, in 1891, they had four children whose names and ages were as follows: Elizabeth, 12 years; Alberta, 10 years; Edward, 3 years; Vera, 1 year. In 1895 a niece of his wife named Jane Gault, one year younger than Vera, was added to the family. The largest wages Stotts is shown to have earned was $70 per month, and with family expenses, sickness, etc., he fell behind in his payments upon this land contract until there remained a balance yet unpaid of $953.20 when the whole amount had become due, in 1897. Between that time and April, 1903, when he married his second wife, the amount was reduced to $768.12, an average reduction of $2.25 per month. When Stotts' first wife became ill some time before her death, his eldest daughter, Elizabeth, who had been working out for a year or so and contributed to the family support, gave up her employment, remaining at home to care for her mother and the children and doing the household work. After her mother's death, she continued at home as housekeeper for her father and cared for the family.

Owing to Stotts' continued delinquency in payments on his contract, Mr. Wynne, representing the Hall estate, became so dissatisfied that in 1903 he threatened foreclosure unless larger payments would be made. Stotts was then contemplating marriage with his present wife, Sarah, and proposed to assign the defaulted land contract to his daughter Elizabeth. He testified that his reason was the older daughters made it unpleasant for him when he told them he was going to get married and they agreed if he would do this "everything would be lovely." He also denied that

Mr. Wynne had ever told him he was in default or pressed him for payment. Wynne testified that, after he had insisted on Stotts making larger payments and written him relative to the matter, Stotts came to his office with a proposal to assign the contract to his eldest daughter, Elizabeth, "because he thought it would be more desirable," and Wynne told him if that was done he would show more leniency, saying:

"I insisted upon some arrangement whereby he should make larger payments on the contract. It had got to a point where we had to do something. I was satisfied to have him assign it to his oldest daughter; she had been working, and the other daughter was going to help, and it struck me that the two young ladies that were paying for their home would use every effort."

An assignment of Stotts' contract to his daughter Elizabeth was thereupon drafted by Wynne and signed by the contracting parties, on April 21, 1903. Upon the same date, Elizabeth gave back to her father a life lease of the property. The expressed consideration in each of these instruments was one dollar.

Stotts' first wife, who died after a lengthy illness, had then been dead about two years, and Elizabeth had from the beginning of her mother's disability devoted herself to caring for the home and family. Owing to the extra expenses in connection with his first wife's sickness and death added to the burden of his family maintenance, Stotts had become financially embarrassed and badly in debt; but with the help of Elizabeth he kept the family together and the younger children in school. The second daughter, Alberta, was attending the public training school for teachers when her mother died and began teaching the following fall. She lived at home and helped as she could there, contributing from her earnings to the family maintenance. During the two years following the first Mrs.

Stotts' death, Stotts was manifestly interested in and doing what he could for his children, and with the help of the two older daughters the family remained united, living together in pleasant and harmonious relations.

Stotts worked for the Detroit Omnibus Company and became acquainted with his present wife, who was for a time a waitress at the lunch counter in the Union Depot. When he announced his purpose to marry her, she was working in a restaurant opposite the Michigan Central Depot. The two older daughters frankly admit that when they learned who it was he intended should take the place of their deceased mother they were opposed to the marriage and tried to dissuade him because they felt, from what they had learned of her, she was not the proper person to place over the younger children nor good enough to be their father's wife; that he was badly in debt, not in a financial condition to marry, and the proposed marriage could only result in disappointment and trouble; but when he persisted in the project they acquiesced, and after the parties were married, at Windsor, across the river, on April 22, 1903, they visited her in friendly recognition of the new relationship and urged her, as he desired, to come with their father to the family home to live with them. This the newly married couple soon did, and Stotts states the daughters were very nice to him and his wife for a few days, until a demand was made upon them to pay board, when trouble started. His daughters ascribe the trouble which developed to other causes, claiming that the stepmother was not pleased with the ready-made family of her husband, was unkind to the younger children, dissatisfied with the place and surroundings, unaccustomed to and disliked the burden of caring for a household, preferred the downtown district, where she said it was more lively, was

often away large portions of the day, neglected the
home and failed to provide or prepare food for the
children, was inclined to be severe with the younger
members of the family and quarrelsome with the
older ones, and by her complaints to and influence
over their father disaffected him towards them. It
is undisputed that uncongenial conditions soon devel-
oped in the family, and Stotts sided with his wife
in the disagreements which arose. After remaining
there about three months, Stotts and his wife left.
He gives as reasons that his children made it uncom-
fortable, "quarreling night and day with me," and
"we left and went downtown, and wanted to keep
roomers and make what money we could."

The evidence indicates quite clearly that, in defer-
ence to his wife's desires, Stotts planned and prepared
to release himself so far as possible from his former
family relations and responsibilities, to permanently
abandon his former home and its burdens, and go with
her where she preferred to live. He had been carry-
ing $3,000 life insurance for years, which, after his
first wife's death, he had made payable to his older
daughters; the policy being in Elizabeth's possession.
He asked her for the policy and said he wanted to
make his second wife his sole beneficiary. Elizabeth
protested that the younger children should participate
to some extent, to which he indicated assent, and she
gave him the policy with an understanding that he
would make his wife a beneficiary to the extent of
$2,000 and Elizabeth $1,000, "to hold for the younger
children." He testified that later he made it all pay-
able to his wife. It was agreed the older girls would
keep Vera and he would assign his life lease of the
property where they lived to Elizabeth. He claimed
to have lost the original, and Alberta went to the office
of Judge Jeffries, who had prepared it, to obtain a
duplicate claimed to have been left with him, but

which he was unable to find; he, however, gave her a blank form and dictated to her the written portion, which she then wrote in pencil. On her return home she wrote the words over in ink, when Stotts signed and dated it as of April 21, 1903; Elizabeth also signing it, and Alberta signing as a witness. In its essentials this copy corresponds with the original, which he claims to have found years later amongst some old papers in his trunk and produced at the hearing. He thereupon executed the following assignment indorsed upon the instrument:

"In consideration of $1.00 (one dollar) I hereby assign and transfer all my right unto and interest in within lease to Elizabeth Stotts.
"Dated July 21, 1903.
"G. E. STOTTS."

On July 23, 1903, Stotts and his wife left the place and established their home elsewhere, taking with them his boy Edward and the adopted girl Jane. They also took substantially all the furniture and household effects. Some unpleasantness developed over this; Elizabeth especially protesting against their taking the piano, which her father had given her, and insisting that if they did she should be paid for her services as housekeeper during the time she had remained at home since her mother's death working without wages. The matter was compromised by the piano being left in consideration of a receipt in full for her wages.

Although prior to his second marriage Stotts had manifested an affectionate interest in the welfare of his children and, as they testify, was kind to them, he thereafter underwent a radical change in that particular. Having relieved himself of and severed all relations with his daughters, within three months thereafter he turned Edward, his only child remaining with him, out of his house and sent him adrift. Edward returned to his sisters, who received and cared

for him as a member of their family, bought him clothing, paid for his nursing, surgical services, and hospital bills during a serious illness, and assisted him until old enough and well enough to support himself. Jane, the adopted girl, remained with Stotts and his wife until 18 years of age, when she left to work out and care for herself. At the time of hearing this case, she was a married woman, apparently pleasantly situated, with a home and family. She appeared as a witness for defendant. Amongst other things, she told of Edward being put out soon after they moved downtown, and said:

"Mrs. Stotts used to strike me once in a while. She had a rather quick disposition, and when she is angry she acts quite angry, and has a pretty good sized temper."

Mrs. Stotts' acrimonious testimony on cross-examination lends color to this view.

For twelve years after plaintiffs had left these premises under the circumstances related and relieved themselves of his children by his first wife, they never visited the family or place, manifested no interest in either, made no claims and recognized none either as to the place or family, and all advances made by the children to be on friendly terms with their father were rejected or ignored. When at different times notified of the serious illness of his two younger children, as the daughters testify, he did not visit them, manifested no interest, and refused to help the older girls in defraying Edward's expenses at the hospital, where he underwent a necessary surgical operation. Of this Stotts testified in one portion of his examination that the older girls had agreed to support those children, and he wanted them to keep their agreement; that after he left he had "no communication with them at all" and did not know of the serious illness of either of the children. He also admitted

that he himself put Edward out of his house and knew that "Elizabeth and Alberta helped him in the hospital and took care of him," stating that he was under no obligations to provide for his youngest child Vera, "because they agreed to support her if I would leave her with them." They did in fact support, clothe, care for, and send her to school for over seven years, until she graduated from the high school and had secured a position, after which she lived with her sisters and paid board until married. Telling of their early experiences after their father left them, she concluded her direct testimony by saying:

"Our struggle was very difficult, and we had a hard time to get along. I am now married, have a happy, pleasant home, and a little baby."

After Alberta had taught successfully for a time, helping Elizabeth in the support of Vera and payments on the place, she married, and for some years she and her husband lived with Elizabeth and Vera, under an arrangement by which they helped make repairs on the house and payments on the property; Elizabeth having some time before assigned to Alberta a half interest in the land contract. In 1908 they all moved from the place, and it was rented thereafter, bringing $18.50 per month rental most of the time. During over 12 years following plaintiffs' hegira under the circumstances shown, his daughters not only relieved Stotts of the care and support of the two younger children, but paid the taxes, insurance, and repairs on the property, and made payments to Mr. Wynne upon the contract as best they could, until it was finally fully paid and the deed ready to deliver to them, when plaintiffs began this suit and restrained delivery by temporary injunction. Wynne testified that he then had the deed made out, and was about to deliver it, when the injunction was served upon

him, and knowing the girls and the family for years, he went to see Stotts about it; but Stotts then asserted his signature to the assignment of the contract to Elizabeth was a forgery, which Wynne knew was false, as he had seen him sign it, and so he refused to talk further with him. This Stotts denied, and admitted executing the assignment of the land contract, but swore that his claimed signature to the indorsed assignment of the life lease to Elizabeth was a forgery. Not only was the testimony otherwise convincing to the genuineness of the indorsement, but when confronted with this signature in connection with several others which he had testified were his, all so arranged that he could not tell to what documents they belonged, he unequivocally identified this signature as genuine and pointed out one of the others as the forgery. His excuse for slumbering upon his claimed rights for over 12 years, and until the land contract had been paid in full, was that he only discovered his lost life lease amongst some old papers in his trunk shortly before he instituted proceedings.

The three propositions upon which he bases his right of recovery are stated in his counsel's brief as follows:

"*First.* The assignment by George E. Stotts to Elizabeth E. Stotts, one day before the marriage, was a legal fraud as to Sarah, thereby depriving her both of a homestead and of dower, and was void as to Sarah Stotts.

"*Second.* The life lease, being in writing, could not be contradicted by parol.

"*Third.* Such life lease, if valid, could not be assigned or surrendered while the premises were occupied as a homestead without the wife, Sarah Stotts, joining in the assignment or surrender."

We discover little force in the first proposition. At the time the contract was assigned to Elizabeth, defendants sustained no family or fiduciary relations

with Sarah. She was not Stotts' wife nor a member of his family. Whatever fraudulent representations he may have made to her as to this property, as an inducement to marry him, it is very evident defendants were not aiding or abetting him, nor in any sense a party to them. In fact, as matters then stood he was unloading upon his daughter a liability which was pressing him, rather than an asset, spurred to do so by Wynne's demand that something be done and a threat to foreclose, coupled with the inducement that leniency might be shown the older daughters, in whom he had more faith than in Stotts.'

The proposition that the life lease in writing could not be contradicted by parol is directed to the admission of parol evidence as to the consideration for it. The expressed consideration in the assignment of the contract to Elizabeth, the life lease from her to Stotts, and his surrender of the life lease to her was but merely the nominal sum of one dollar. Defendants were permitted to show against objection that the mutual obligations and considerations for the assignment of the land contract and contemporaneous life lease were that, in anticipation of the family living together in the home, which he was otherwise about to lose, Elizabeth would accept and assume the burden of the contract with Wynne, paying $20 per month thereon and interest, while Stotts on his part would pay her $10 per month to be applied on the land contract, and make necessary repairs on the property. During the three months he remained there with his wife he paid but $10. The consideration for the surrender of his life lease was not only a release from the $10 per month he was to pay, the repairs upon the premises he was to make, and all other burdens in connection with the contract, but from the care, education, support, and maintenance of Vera, as Stotts himself testified. While denying the reassignment of

the life lease, he testifies that, at the time he and his wife moved away:

"The arrangement was, if I left Vera, that they would take care of her and support her and she would be no bother to me."

While the consideration expressed in a written instrument is *prima facie* to be taken as the actual consideration, the rule is well settled by abundant authority that parol evidence is admissible to show that the true consideration was greater than or different from that expressed. That there was a consideration in addition to the nominal one stated may always be shown when material. An examination of the following citations, and others to which they lead, will make clear the rule and reason for it: *Mowrey* v. *Vandling*, 9 Mich. 39; *Colman* v. *Post*, 10 Mich. 422 (82 Am. Dec. 49); *Kimball* v. *Myers*, 21 Mich. 276 (4 Am. Rep. 487); *Trevidick* v. *Mumford*, 31 Mich. 467; *Garton* v. *National Bank*, 34 Mich. 279; *Strohauer* v. *Voltz*, 42 Mich. 444 (4 N. W. 161); *Wood Mowing & Reaping Mach. Co.* v. *Gaertner*, 55 Mich. 453 (21 N. W. 885); *Flynn* v. *Flynn*, 68 Mich. 20 (35 N. W. 817); *Macomb* v. *Wilkinson*, 83 Mich. 486 (47 N. W. 336); *Cook* v. *Curtis*, 68 Mich. 611 (36 N. W. 692); *Cutler* v. *Steele*, 93 Mich. 204 (53 N. W. 521); *Church* v. *Case*, 110 Mich. 621 (68 N. W. 424); *Brown* v. *Smedley*, 136 Mich. 65 (98 N. W. 856); *Ruch* v. *Ruch*, 159 Mich. 231 (124 N. W. 52); *Scovel* v. *City of Detroit*, 159 Mich. 95 (123 N. W. 569); *Blanchard* v. *Ridgeway*, 179 Mich. 491 (146 N. W. 139); *Smith* v. *Maxey*, 186 Mich. 151 (152 N. W. 1011); Jones on Evidence (2d Ed.), § 469; *Velten* v. *Carmack* (20 L. R. A. 101), 23 Or. 282 (31 Pac. 658).

The trial court was not in error in permitting evidence of the true consideration for the instruments involved in this controversy and of the performance

or nonperformance of their obligations by the parties to them.

It is undoubtedly true, as contended by plaintiff, that by an assignment of his life lease in which his wife did not join Stotts could not deprive her of whatever homestead rights she held under it. At the time she married him, he, as the holder of the life lease, was but a tenant of Elizabeth, under an agreement to make repairs upon the property and pay $10 per month to help her make good his former delinquencies on the land contract and save the property. His wife's homestead rights rested on his tenure, and at the time they abandoned the property he had defaulted in his obligations to·assist in paying up the contract. A "homestead right" is an artificial estate in land for the protection of the family in possession of it as a home. Its character as such depends upon both possession and actual intention of the parties. Though they may live elsewhere temporarily and, intending to return, retain their homestead rights, "it is largely a matter of continuing intent, and is a fact to be proved like any other fact." *Hoffman* v. *Buschman*, 95 Mich. 538 (55 N. W. 458).

"Where the owner leaves his homestead, it is incumbent upon him to prove an intention to return, since a removal is ordinarily *prima facie* evidence of an abandonment. If the homesteader removes with his family, the consent of his wife will be presumed." 21 Cyc., p. 621.

While living there, Sarah did not like the place, was dissatisfied with the location because too remote and quiet, said she would die if she had to live there, that it was too slow for her, and she wanted to move downtown. That her husband yielded to her importunities, made his plans accordingly, abandoned the place and project of helping pay for it, and they by mutual consent left together with no intention of ever

returning to it as their home, is fairly shown both by what transpired at the time of their departure and their conduct in the years which followed.

The surrender of the life lease to Elizabeth by Stotts' assignment indorsed upon the back without his wife's signature, even if irregular, informal, and without force against her homestead rights, was a part of the program of separation from his children, and all relations with them, and, in connection with other attending facts and circumstances, is at least evidence of an intention on his part to permanently abandon this property and with his wife make a home elsewhere. She was neither forced nor deceived into going, but, on the contrary, was anxious to go. We are well satisfied that the facts and circumstances show an abandonment of this property by them with such intent and purpose for the future that its character as a homestead ceased as to them. Thereafter they remained away and silent for more than 12 years, claiming nothing and doing nothing as to this property until his younger children were of age and out of the way, and the contract upon which he had defaulted fully paid up; then, under such changed conditions, they for the first time seek to assert the wife's homestead rights to the property on the ground that she did not join her husband in the surrender of his lease, which was of doubtful value, and, aside from other considerations, had been more than fully compensated by what his older daughters did in raising and educating his youngest child.

We agree with the trial court in the conclusion that, not only was the burden of Stotts placed upon his daughters by the contract, as its terms are admitted by him, unfair and unconscionable, but that by their subsequent conduct and laches plaintiffs are now estopped from asserting the rights they claim in a

court of equity. *Bovine* v. *Selden*, 155 Mich. 556 (119 N. W. 1090, 130 Am. St. Rep. 579).

The decree of the trial court is affirmed, with costs to defendants.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.