**UNITED STATES of America, Plaintiff and counter-defendant,**

v.

**Gordon H. PORATH and Georgina M. Porath, Defendants and counter-plaintiffs.**

**Case No. 08–10166.**

United States District Court, E.D. Michigan, Southern Division.

Feb. 3, 2011.

Douglas W. Snoeyenbos, Christine Hooks, U.S. Department of Justice, Washington, DC, for Plaintiff and counter-defendant.

Andrew S. Campbell, Michele L. Halloran, Naima I. Manley, Michigan State University, East Lansing, MI, for Defendants and counter-plaintiffs.

### OPINION AND ORDER DENYING MOTION FOR JURY TRIAL AND DETERMINATION FOLLOWING TRIAL BY THE COURT WITHOUT A JURY

DAVID M. LAWSON, District Judge.

The United States has filed a complaint against defendants Gordon and Georgina Porath to foreclose a tax lien on the Poraths' house in Brighton, Michigan, currently titled in Mrs. Porath's name. An assessment was made against defendant Gordon Porath on October 28, 1991 for unpaid income and Social Security taxes withheld from Mr. Porath's company. The government contends that in 1991, Mr. Porath transferred his interest in the house to his spouse in order to avoid his tax obligations to the Internal Revenue Service (IRS). The government claims that despite the formalities of the title transfer, a tax lien attached to half of Mrs. Porath's interest in the house either because she acted as Mr. Porath's nominee, or because Mr. Porath's 1991 transfer to Mrs. Porath may be set aside under the Michigan Fraudulent Conveyance Act. The Poraths, on the other hand, contend that the transfer occurred in 1987 by virtue of a hand-written postnuptial agreement they both signed, and therefore, the government's contentions are without merit.

The defendants filed a motion for a jury trial. The Court verbally denied that motion, promising a written opinion to follow, and the case proceeded to trial before the Court sitting without a jury. Trial began on April 7, 2009, and the proofs concluded the same day. The Court heard the testimony of three witnesses (one by video deposition) and received 16 exhibits. The parties filed post-trial briefs and proposed findings. The following constitutes the Court's ruling on the motion for jury trial and its findings of fact under Federal Rule of Civil Procedure 52(a)(1), followed by its application of the governing law.

### I. Background

The case stems from an assessment made against Gordon Porath as a result of the failure of the U.S. Computer Corporation to remit to the IRS income and Social Security taxes that had been withheld from the wages of its employees under the Federal Insurance Contributions Act

(FICA). Gordon Porath was the majority shareholder of the U.S. Computer Corporation and learned about the unpaid tax withholding before the corporation ceased operating in July 1989. On February 5, 1990, Gordon Porath was interviewed by IRS revenue officer Anthony Cipparone as part of Cipparone's trust fund recovery penalty investigation. On October 28, 1991, the IRS assessed unpaid taxes and penalties of $66,932.66 against the U.S. Computer Corporation for failing to pay employee income taxes for the last three quarters of 1988 and for the first two quarters of 1989. The IRS sought to hold Dominic Morinelli, a co-owner of U.S. Computer Corporation, and Gordon Porath jointly liable as "responsible parties" under 26 U.S.C. § 6672, and on March 17, 1994, a judge of this Court entered a judgment against Gordon in the amount of $66,932.66. *Morinelli v. United States,* No. 92–73941 (E.D.Mich. Mar. 17, 1994).

A Notice of Federal Tax Lien on the Brighton property was recorded in Livingston County, Michigan against Gordon on August 21, 1995 and against Georgina on June 1, 2004. The government seeks to collect the judgment amount by foreclosing on the house in Brighton that once belonged to the Poraths as husband and wife, but has since been transferred into sole ownership of Georgina Porath.

In an attempt to fight the government's collection effort, Georgina Porath filed an action to quiet title in this Court on September 21, 2007. In turn, the government filed the present foreclosure action on January 11, 2008, naming both Georgina and Gordon Porath as defendants. Georgina dismissed her quiet title action voluntarily and filed it as a compulsory counterclaim in the present action.

The parties filed cross motions for summary judgment, which the Court denied because of unresolved fact issues surrounding the purported transfer of the property to Georgina in 1987. The Court scheduled the case for trial.

## II. Motion for Jury Trial

■ The defendants sought a jury trial in their answer to the complaint and by motion filed on March 17, 2009. The Seventh Amendment to the United States Constitution states: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." For nearly two centuries, the Supreme Court has construed the "Suits at common law" phrase to mean "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830). The right to a jury trial does not extend to litigants filing claims seeking equitable relief. *Tull v. United States,* 481 U.S. 412, 417–18, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

■ The same right to trial by jury is preserved in Rule 38(a) of the Federal Rules of Civil Procedure, which declares that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution—or as given by a federal statute—is preserved to the parties inviolate." Fed.R.Civ.P. 38(a). To ascertain one's eligibility for jury trial, courts analyze whether the action would be addressed in courts of law or courts of equity in 18th Century England before the merger of law and equity; whether the relief sought by the plaintiff in the case is legal or equitable in nature; and "the practical abilities and limitations of juries." *Ross v. Bernhard,* 396 U.S. 531, 533, 538 n. 10, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). "[W]here equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal

issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims. The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." *Id.* at 537–38, 90 S.Ct. 733; *see also Tull,* 481 U.S. at 417–18, 107 S.Ct. 1831 ("First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.").

■ In the present case, the plaintiff seeks to foreclose a lien, and the defendants seek to quiet title in real property. It is beyond dispute that these actions have their historical origins in courts of equity. *Damsky v. Zavatt,* 289 F.2d 46, 53 (2d Cir.1961) (observing that "[f]oreclosure of the mortgagor's equity of redemption was an established head of equity jurisdiction well before 1791") (citing *How v. Vigures,* 1 Rep. Ch. 32, 21 E.R. 499 (1923), and *Emanuel College v. Evans,* 1 Rep. Ch. 18, 21 E.R. 494 (1625)); *Sackett v. Atyeo,* 217 Mich.App. 676, 680, 552 N.W.2d 536, 538 (1996) ("Actions to quiet title are equitable in nature. . . ."). If there were a claim by the government for a money judgment for unpaid taxes against either of the defendants, a jury trial would be in order. *Damsky,* 289 F.2d at 48–53; *see also United States v. Anderson,* 584 F.2d 369, 373 (10th Cir.1978); *United States v. McMahan,* 569 F.2d 889, 892 (5th Cir. 1978) (holding that the defendant, who was alleged by the United States to be responsible for collection of taxes under sections 6671(b) and 6672 of Title 26, has the right to demand jury trial even where the government in the same action seeks equitable relief from the defendant's wife and others to set aside conveyances and to foreclose its lien against property formerly owned by him and subsequently conveyed to others); *cf. Farmers–Peoples Bank v. United States,* 477 F.2d 752, 756 (6th Cir.1973) (calling "well-reasoned" the Second Circuit opinion in *Damsky,* in which the court held that a defendant in an *in personam* action to recover federal income taxes was entitled to trial by jury). No such remedy is sought in this case, however.

Nonetheless, the defendants contend that what the government seeks at its base is to set aside a fraudulent conveyance, and the Supreme Court in *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), held that the Seventh Amendment requires a jury trial in such actions. Not necessarily, however. In *Granfinanciera,* a trustee in bankruptcy sued a third party to recover a specific sum of money, which the trustee contended had been paid over to the defendant by the debtor within a year of the bankruptcy proceedings. The lower courts held that no jury trial was allowed because suits to set aside fraudulent conveyances were equitable in nature, the action to set aside the fraudulent transfer was a core bankruptcy proceeding to which no right to a jury trial attached, and bankruptcy proceedings historically were equitable in nature. The Supreme Court took a different view. It cited 18th-Century English cases demonstrating that suits to set aside fraudulent transfers were often bought in law courts, and concluded "that courts of equity had concurrent jurisdiction with courts of law over fraudulent conveyance actions." *Id.* at 43, 109 S.Ct. 2782. Where the relief "sought [was] the recovery of a fixed sum of money without the need for an accounting or other equitable relief," *id.* at 45–46, 109 S.Ct. 2782, as in the case then before the Court, the Court determined that the action was at law and the right to a jury trial applied. Historically, the Court found, suits to recover money or chattels were treated differently than suits involving title to real property. In drawing

that distinction, the Court quoted the following treatise:

> "[W]hether the trustee's suit should be at law or in equity is to be judged by the same standards that are applied to any other owner of property which is wrongfully withheld. If the subject matter is a chattel, and is still in the grantee's possession, an action in trover or replevin would be the trustee's remedy; and if the fraudulent transfer was of cash, the trustee's action would be for money had and received. Such actions at law are as available to the trustee to-day as they were in the English courts of long ago. *If, on the other hand, the subject matter is land* or an intangible, or the trustee needs equitable aid for an accounting or the like, *he may invoke the equitable process, and that also is beyond dispute.*"

*Id.* at 44, 109 S.Ct. 2782 (quoting 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, pp. 183–184 (rev. ed.1940) (footnotes in original omitted; emphasis added)). The quoted language is illuminating, and it serves to distinguish this case from the general proposition the defendants urge. The Court held that the Seventh Amendment requires a jury trial when the action is to set aside the fraudulent conveyance of a specific sum of money. The Court did *not* hold that an action to set aside the fraudulent conveyance of land, traditionally heard by courts of equity, *see Hobbs v. Hull,* 1 Cox 445, 29 Eng. Rep. 1242 (Ch. 1788) (cited in *Granfinanciera,* 492 U.S. at 45–46, 109 S.Ct. 2782), entitles the parties to a jury trial.

Since *Granfinanciera* was decided, some courts have held that suits to set aside fraudulent transfers, even of real property, trigger the Seventh Amendment right to a jury trial. *In re Pasquariello,* 16 F.3d 525, 530 n. 9 (3d Cir.1994) (citing *In re Stoecker,* 117 B.R. 342 (N.D.Ill.1990)); *In re Lee Way Holding Co.,* 115 B.R. 586 (S.D.Ohio 1990), *rev'd on other grounds,*

956 F.2d 1164 (6th Cir.1992); *In re Southeast Connectors, Inc.,* 113 B.R. 85 (S.D.Fla.1990); *Michaels v. Lomax (In re Skil–Aire Corp.),* 142 B.R. 692 (Bankr. D.N.J.1992); *Beeline Eng'g & Constr. Inc. v. Monek,* 139 B.R. 1025 (Bankr.S.D.Fla. 1992); *In re Roberts,* 126 B.R. 678 (Bankr. W.D.Pa.1991); *see also In re. C.J. Rogers, Inc.,* 212 B.R. 265, 275 (E.D.Mich.1997) (characterizing *Granfinanciera* as holding that "a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when the trustee sues him or her in bankruptcy to recover a fraudulent conveyance."). But the actions here are to foreclose a lien on and quiet title in land. In *Granfinanciera,* the Court, quoting *Tull v. United States,* directed lower courts first to compare the present action to those brought in English courts before the merger of the courts of law and equity, and then "examine the remedy sought and determine whether it is legal or equitable in nature." *Granfinanciera,* 492 U.S. at 42, 109 S.Ct. 2782. The Court instructed that "[t]he second stage of this analysis is more important than the first." *Ibid.* The remedies sought in this case are foreclosure and the quieting of title. They are quintessentially equitable in nature. *See Rozelle v. Conn. Gen. Life Ins. Co.,* 471 F.2d 29 (10th Cir. 1972) (finding no right to jury trial in a foreclosure proceeding); *Damsky,* 289 F.2d at 53 (finding that "foreclosure through decree of sale, provided for United States tax liens by I.R.C. § 7403, is sufficiently akin to the historic equity practice to preclude successful contention for a right to jury trial with respect to the ascertainment of the amount of the tax lien as against taxpayer's property and enforcement of the lien by sale."); *United States v. McHan,* 345 F.3d 262, 275–76 (4th Cir.2003) (observing that a forfeiture action to take land as substitute property "would be most analogous to an equitable

petition to quiet title to the forfeited property for which no jury was traditionally available"); *Humble Oil & Refining Co. v. Sun Oil Co.,* 191 F.2d 705, 713–14 (5th Cir.1951) (holding that a suit to establish title to and recover possession of oil and gas leasehold interest in land, to remove clouds from title, and to enjoin interference with use of property was not a common-law action of ejectment, or one in nature of ejectment, but was a suit of an equitable nature to quiet title, and aid of a jury was discretionary); *Harlan v. Sparks,* 125 F.2d 502, 506–07 (10th Cir.1942) (holding that an action to quiet title to an interest in New Mexico land, where there was no ouster, and possession was not sought, was essentially an action in equity, and denial of the defendants' demand for trial by jury was proper). The Court concludes, therefore, that the Seventh Amendment does not entitle the parties to a jury trial.

III. Evidence and Conclusions of Fact

Georgina Porath and Lee Gates testified in person at trial. Gordon Porath testified via video deposition taken on April 1, 2009. Portions of Gordon Porath's discovery deposition taken on June 12, 2008 also were offered in evidence. The plaintiff offered fourteen exhibits and the defendants offered two exhibits. (Defendants' Exhibit 16 is the same document as Plaintiff's Exhibit 3.). The Court received these exhibits. Based on this evidence, the Court finds the following facts.

Gordon Porath, born in 1920, attended the University of Michigan and then Wayne State University. He and Georgina Porath were married in 1942. Gordon served in World War II as an officer in the Army, and the couple resided together since sometime in 1945. The Poraths characterize themselves as folks of the "old school" philosophy under which husband and wife own everything jointly, even though the wife stays at home and the husband does the work.

The Poraths are now nearing their nineties, and one of their three children is suffering from cerebral palsy and is totally disabled. Since 1967, the couple resided in a home located at 11000 East Grand River Avenue in Brighton, Michigan. That residence was Georgina's childhood home, and the couple purchased it on August 19, 1967 for $35,000. They paid cash; no mortgage ever encumbered this property. Prior to January 8, 1991, the record title to this residence was in the name of Gordon and Georgina Porath as tenants by the entireties.

Gordon Porath was involved in several successful business ventures with companies that made machine tooling. He also was involved in commodities trading. In the late 1970s or early 1980s, he entered into the fashion business and co-owned a company known as Midwest Boutiques, which operated a chain of maternity fashion stores known as Lady Madonna Fashions, eventually expanding across the country with 25 stores. His partner, Lee Gates, was in charge of purchasing product, and he handled the business end by negotiating leases, franchise agreements, and other contracts. Around 1982, Gordon Porath turned his attention to the computer business and began U.S. Computer Corporation as a Michigan corporation, with a related Illinois corporation. Dominic Morinelli was brought in to run that part of the business. By 1987, the popularity of the Lady Madonna stores was on the wane, and both Gordon Porath and Lee Gates were trying to find a new niche for themselves. Lee decided to open a smaller-scale maternity clothing store; Gordon decided to buy out the U.S. Computer Corporation and devote his attention to the computer business. Ms. Gates verified many of these details.

The Poraths both testified that Georgina was against Gordon embarking on a new business venture at age 67 because of the financial risk involved. Gordon testified that he had loaned money to Midwest Boutiques, and the amount was the same as that company had loaned to U.S. Computers. The break-up arrangement was that Lee Gates would leave with the fashion business, and Gordon Porath would receive 51 % of U.S. Computers with Dominic Morinelli receiving the other 49%. *See* Pl.'s Ex 4. However, Gordon and Georgina discussed the working capital needs of this new venture, and Georgia was against it.

At the time, Gordon and Georgina owned their house free and clear, they had a joint money market account worth about $208,000, and they each had their separate assets. Gordon testified that he owned a money market account worth $4,000, an IRA worth $13,000, and the business inventory, which he valued at about $213,000. Georgina also had an IRA worth $13,000, and two other money market accounts in her separate name worth $5,000 and $13,000, respectively. They had no personal debt. Georgina had stopped working outside the home when the couple's children were born. The oldest of their three children suffers from cerebral palsy and requires a great deal of care, which Georgina furnished. At the time, Georgina also was providing care for her ailing mother. Georgina was steadfastly opposed to placing their home at risk through Gordon's proposed new venture.

Nevertheless, Gordon made an agreement with Georgina to divide their joint assets, with Georgina taking the right to the house in exchange for allowing Gordon to loan money to U.S. Computer Corporation. They entered into a handwritten postnuptial agreement in the form of a letter that divided their assets. The letter, dated July 9, 1987, stated:

As of July 31, 1987, I will discharge the debt owed to me by Midwest Boutiques, Inc. in exchange for Midwest Boutiques, Inc. assigning its loan receivable from U.S. Computer Corporation to me and 100% of the outstanding shares of capital stock in U.S. Computer Corporation to me. At the same time with the assignment, I will acquire 100% of the outstanding shares of capital stock of U.S. Computer–Chicago, Inc. Next, I will distribute 49% of the outstanding shares of stock in U.S. Computer Corporation to Dominic Morinelli to fulfill an oral promise made by me to Dominic Morinelli. The remaining 51% of the outstanding shares of stock in U.S. Computer Corporation, I will issue to myself.

We both recognize this move [to acquire U.S. Computer Corporation] carries a high risk; and, further, you have stated your opposition to the venture. To use your words, "At our age, I am not going to stand by and watch 45 years of stress and toil go down the drain."

We agree that for your protection (and mine), whenever you desire you may transfer to yourself any and all assets that we hold jointly. This right includes, but is not limited to, transferring to your name the property at 11000 East Grand River, Brighton, Michigan, its buildings and contents and all and any bank accounts, securities, security accounts, and money market accounts, which we agree is fair consideration for your share of the assets we have accumulated.

Defs.' Ex. 15. This letter is signed by Gordon and Georgina Porath only; it was not witnessed or acknowledged by a notary public. Gordon drafted the letter himself without consulting an attorney. The document was never recorded with the county register of deeds.

The Poraths testified that they established the value of their home by doubling the state equalized value noted on their property tax bill, which gave them a value for the property of $74,220. They valued their household furnishings at $50,000, and they ascribed a total value to the Brighton property of approximately $125,000. Following the spirit of the letter, from June 27, 1987 through July 31, 1987, Georgina wrote four checks, numbered consecutively 123 through 126, for the total sum of $65,000; the checks were drawn from the couple's joint cash money management account with Merrill Lynch (which at that time had a balance of $208,000 accumulated through the years from other businesses Gordon owned) and made payable to the U.S. Computer Corporation. *See* Pl.'s Ex 3; Def.s' Ex. 16. The account at Merrill Lynch remained in their joint names. The money in the account came from the sale of Mr. Porath's other businesses, including one titled Century Detroit, which had earned Mr. Porath about $500,000.

The business of U.S. Computer Corporation was a failure, and it closed its doors in 1989. Gordon testified at his April 1, 1993 deposition in the previous tax collection case that he learned that the business owed unpaid federal taxes in late 1988 or early 1989, but he did not believe that he was responsible for them. In a letter to revenue officer Valerie Oatley dated June 28, 2004, Gordon wrote that he first became aware of the corporation's tax liability in November 1991 when he received a notice of intent to levy. *See* Pl.'s Ex. 10.

It was not until January 1991 that formal measures were taken to transfer the record interest of Gordon Porath in the house at 11000 East Grand River Avenue to Georgina Porath. Gordon testified that he took that action on advice from a business partner named Carl. Gordon explained that he and his wife had been trading commodities out of their house, and he believed he should register its proper ownership. He contacted attorney Robert Litt, who drafted the deed. Gordon signed a quit claim deed conveying his interest in the property to Georgina on January 25, 1991. The deed was recorded on January 31, 1991. *See* Pl.'s Ex 1. The deed recites a nominal consideration of one dollar and claims a transfer tax exemption under state law as an instrument where the value of consideration is less than $100. *See* Mich. Comp. Laws § 207.505(a). Georgina acknowledged that she had not seen the quit claim deed until her deposition in this case held on May 29, 2008.

Despite the language in the July 1987 letter—"whenever you desire you may transfer to yourself any and all assets that we hold jointly"—Georgina insists that she intended to be the sole owner of the house from the moment she signed that letter. Both Gordon and Georgina acknowledge, however, that they took no formal action to transfer title to the property until January 1991. In addition, in the June 28, 2004 letter to revenue officer Valerie Oatley, Gordon wrote: "Late in December, 1990, Georgina M. Porath exercised her option as provided in the July 9, 1987 agreement and directed that, where applicable, the house, cars, etc. be legally recorded in her name free and clear." Pl.'s Ex. 10. Georgina claims that she did not know about her husband's troubles with the IRS until this Court entered a judgment against him in 2004.

Now the Poraths' only income comes from their Social Security benefits. Georgina Porath receives about $600 per month, and Gordon Porath receives about $1600 per month. Throughout all of this, Gordon remained domiciled in the home at 11000 East Grand River Avenue. Only Georgina owns a checking account, although both the Poraths' Social Security

checks are direct-deposited into her account. Gordon does not have any signatory authority with regard to this account, and Georgina pays bills, taxes, and other household expenses using her account and gives whatever remains to Gordon for his personal needs. Gordon Porath has no assets in his name; even the car the couple uses is titled in Georgina's name, although she bought it with the funds drawn from the Comerica Bank account funded in part by Gordon's monthly Social Security check. Because Gordon is not a signatory on Georgina's account, it is only through Georgina that he has access to his Social Security income.

Based on the language of the July 1987 letter (Defs.' Ex. 15) and the statements of Gordon Porath, the Court concludes that the defendants intended at that time to convey the right to receive Gordon Porath's undivided one-half interest in the Brighton home to Georgina Porath. Consideration for that agreement was given in the form of permission by Georgina to allow Gordon to use a portion of their joint assets in his computer business venture. However, that right was not exercised until the deed (Pl.'s Ex 1) was executed on January 25, 1991 and recorded with the Livingston County, Michigan register of deeds on January 31, 1991, after Gordon's business had failed and he had become liable for unpaid employment taxes.

In December 1991, Gordon wrote a letter to the IRS acknowledging the Notice of Intent to Levy dated November 18, 1991. At the time of the letter, Gordon professed to be insolvent. He wrote that he lost his life's savings in the failed business. He stated, "My last resource was a lifetime IRA which was withdrawn for living expenses a year and a half ago. Now I have nothing—absolutely no assets—no cash—no property—no car—no securities—no bank account. My only income is my social security check of $962.00." Pl.'s Ex 2.

As noted earlier, the responsibility for the tax trust fund liability was the subject of a lawsuit involving the government, Dominic Morinelli, and Gordon Porath. A separate judgment was entered against Gordon in favor of the government in the amount of $66,932.66 on March 17, 1994. It does not appear that the judgment has been satisfied.

### IV. Conclusions of Law

This is a case to foreclose a federal tax lien that has attached to real property, and a counterclaim to quiet title to that property. The Court has jurisdiction on the foreclosure claim under 28 U.S.C. §§ 1340, 1345, and 26 U.S.C. § 7402(a). The Court has jurisdiction over the counterclaim under 28 U.S.C. § 2410(a).

A point not in dispute in this case is Georgina Porath's right to her undivided one-half interest in the Grand River Avenue property. The government does not contend that she is personally responsible for Gordon Porath's individual tax liability. Instead, the government argues that the *other* half of the property interest is subject to foreclosure because the transfer of it by Gordon ought to be set aside, or it was a sham and Georgina holds that half as Gordon's nominee.

### A. Statute of Limitations

The defendants first argue that the government's suit is out of time because the tax was assessed against Gordon on October 28, 1991 and this lawsuit was not filed until January 11, 2008. They point to 26 U.S.C. § 6502(a), which establishes a ten-year statute of limitations on actions to collect assessed taxes. Section 6502(a)(1) does state that a civil action to collect a tax must be commenced "within 10 years after the assessment of the tax." But the statute also provides:

> If a timely proceeding in court for the collection of a tax is commenced, the

period during which such tax may be collected by levy shall be extended and shall not expire until the liability for the tax (or a judgment against the taxpayer arising from such liability) is satisfied or becomes unenforceable.

26 U.S.C. § 6502(a).

Section 6321 of the Internal Revenue Code creates a statutory lien against all property and rights to property belonging to a delinquent tax payer. *Redondo Const. Corp. v. United States,* 157 F.3d 1060, 1062–63 (6th Cir.1998). The tax lien extends to a person's property if the "person liable to pay any tax neglects or refuses to pay the same after demand." 26 U.S.C. § 6321. The lien imposed by this statutes arises at the time of the assessment and continues "until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. § 6322.

■ "A lien becomes unenforceable by lapse of time upon expiration of the [ten-year] statute of limitations for collection, but if the government brings suit within [ten] years from assessment and receives a judgment in its favor, the life of the lien is extended indefinitely." *Markham v. Fay,* 74 F.3d 1347, 1353 (1st Cir. 1996). Therefore, "[t]here is no time limit whatsoever on an action against the taxpayer to enforce a timely levy or judgment obtained in a timely filed court proceeding." *United States v. Weintraub,* 613 F.2d 612, 620–21 (6th Cir.1979). Once liability has been established, there is no time limitation in section 6502 for enforcement actions. *Id.* at 621 n. 30 (listing cases in which foreclosure suits filed after the ten-year period were not considered time-barred); *United States v. Overman,* 424 F.2d 1142, 1147 (9th Cir.1970) (holding that once the judgment against a taxpayer is secured within the applicable statute of limitations, the life of the lien is endless); *Hector v. United States,* 255 F.2d 84, 86 (5th Cir.1958) (same).

■ In this case, the initial assessment against Gordon Porath was made on October 28, 1991, and the notice of assessment and demand for its payment were sent to Mr. Porath within five days of the assessment. A lien on Mr. Porath's property arose at the time of the assessment on October 28, 1991. When Mr. Porath refused to make a payment, the government sued him in the Eastern District of Michigan. On March 17, 1994, this Court entered a money judgment for the United States, finding Gordon Porath responsible for the unpaid trust fund taxes. The time limit for enforcing that lien is extended indefinitely. The present action, commenced on January 11, 2008, therefore is timely.

### B. Quiet Title Action

■ In Michigan a quiet title action is a statutory cause of action. Michigan Compiled Laws § 600.2932(1) states that "[a]ny person, whether he is in possession of the land in question or not, who claims any right in, title to, equitable title to, interest in, or right to possession of land, may bring an action in the circuit courts against any other person who claims or might claim any interest inconsistent with the interest claimed by the plaintiff." This statute "codifie[s] actions to quiet title and authorize[s] suits to determine competing parties' respective interests in land." *Republic Bank v. Modular One L.L.C.,* 232 Mich.App. 444, 448, 591 N.W.2d 335, 337 (1998), *overruled on other grounds by, Stokes v. Millen Roofing Co.,* 466 Mich. 660, 649 N.W.2d 371 (2002). The parties seeking to establish clear title have the burden of proof in a quiet title action, and they must make out a *prima facie* case that they have title to the disputed land.

*Beulah Hoagland Appleton Qualified Pers. Residence Trust v. Emmet Cnty. Rd. Comm'n*, 236 Mich.App. 546, 550, 600 N.W.2d 698, 700 (1999) (citing *Stinebaugh v. Bristol*, 132 Mich.App. 311, 316, 347 N.W.2d 219 (1984)). If the plaintiffs establish a *prima facie* case, the burden of proof shifts to the contestant to establish superior right or title to the property. *Beulah*, 236 Mich.App. at 550, 600 N.W.2d at 700 (citing *Boekeloo v. Kuschinski*, 117 Mich.App. 619, 629, 324 N.W.2d 104 (1982)). An action to quiet title is equitable in nature. *Ibid.* If a defendant fails in its proof and "the plaintiff established his title to the lands, the defendant shall be ordered to release to the plaintiff all claims thereto." Mich. Comp. Laws § 600.2932(3).

### 1. 1987 Letter

Georgina Porath claims title to the Brighton property through the letter agreement drafted in the summer of 1987. The parties disagree as to the effect of the July 9, 1987 letter on the ownership of the Brighton property. The plaintiff argues that the letter was ineffective to achieve an actual transfer of Gordon Porath's interest in land at that time. The defendants insist that their intent was to effectuate an immediate transfer of Gordon's interest in the property to Georgina. The law does not favor the defendants' position and the facts suggest otherwise as well.

■ "In order to transfer an interest in realty the grantor owning such interest with intent to so do must execute an instrument sufficient to meet the requirements of Lex situs of the realty." *Michigan State Highway Comm'n v. Sandberg*, 12 Mich.App. 475, 481, 163 N.W.2d 276, 278–79 (1968) (quoting 6 Thompson, *Real Property*, p. 1, § 2935). The property in this case is located in Livingston County, Michigan, and Michigan law applies in this case. *See United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985). The applicable statute states that "[c]onveyances of lands, or of any estate or interest therein, may be made by deed, signed and sealed by the person from whom the estate or interest is intended to pass, being of lawful age, or by his lawful agent or attorney, and acknowledged or proved and recorded as directed in this chapter, without any other act or ceremony whatever." Mich. Comp. Laws § 565.1. "The elements of an instrument of conveyance are a grantor, a grantee, a thing conveyed, consideration stated, words of grant, signature, acknowledgment, delivery, acceptance and recording." *Sandberg*, 12 Mich.App. at 481, 163 N.W.2d at 279 (quoting 7 *Callaghan's Michigan Civil Jurisprudence*, § 9, p. 3). In order to transfer an interest in real property, "it is essential that a written instrument contain at least language manifesting an intention on the part of a grantor to transfer such interest in property." *Id.* at 481, 163 N.W.2d at 278. And "[t]here must be specific words of conveyance to pass an interest in land." *Id.* at 481, 163 N.W.2d at 279 (citing *Zemon v. Netzorg*, 247 Mich. 563, 565, 226 N.W. 242, 242 (1929)).

■ To be enforceable, a contract for the transfer of real property must contain the essential elements of any contract: a description of the parties and the property, consideration, terms, and time of performance, all expressed "with sufficient certainty and definiteness." *MacRitchie v. Plumb*, 70 Mich.App. 242, 245, 245 N.W.2d 582, 584–85 (1976).

■ A person relying on a deed must prove by preponderance of evidence that the deed was delivered to the grantee and it reflected the grantor's present and unconditional intention to convey his interest in the property. *See Havens v. Schoen*, 108 Mich.App. 758, 760–61, 310

N.W.2d 870, 871 (1981). Valid delivery may be achieved even if the deed is not recorded. *Schmidt v. Jennings*, 359 Mich. 376, 383, 102 N.W.2d 589, 593–94 (1960). In determining whether the grantor has the present intention to transfer title to property, a court may look to subsequent acts by the grantor. *Haasjes v. Woldring*, 10 Mich.App. 100, 102, 158 N.W.2d 777, 778 (1968) (holding that where grandparent-grantors continued living at and paying for the property after the alleged transfer, and where the deed was not placed beyond the grantor's control, a valid transfer had not been effectuated).

This Court has held in the past that the absence of certain formalities such as acknowledgment and recording are not fatal to a finding of an intent to transfer property. *See Sumpter v. United States*, 302 F.Supp.2d 707, 721–23 (E.D.Mich.2004) (Lawson, J.). Nevertheless, Michigan law is clear that in order to effectuate a conveyance of land, the grantor "must have intended to presently and unconditionally convey the interest and must have delivered the property to [the grantee]." *In re Estate of Barkman*, No. 212811, 2000 WL 33522375, at *2 (Mich.Ct.App. March 10, 2000) (citing *Havens v. Schoen*, 108 Mich. App. 758, 761, 310 N.W.2d 870, 871 (1981), and *Energetics, Ltd. v. Whitmill*, 442 Mich. 38, 53, 497 N.W.2d 497, 505 (1993)).

■ The defendants have not met their burden of establishing title through the letter dated July 9, 1987. The language in the letter is far from unconditional and it does not bespeak of a *present* intent to transfer the Brighton property. To the contrary, the letter indicates Gordon's permission to Georgina to transfer the listed assets (which include the house) "whenever you desire." These are not words of a grant, and the instrument was not effective to convey the real property to Georgina *at that time*. The Court believes that Gordon's later characterization of the July 1987 agreement is most accurate. He called it an "option," which Georgina exercised in December 1990. *See* Pl.'s Ex. 10. Until that option was exercised and a deed was executed, Gordon retained his interest in the property.

### 2. 1991 Deed

■ The quit claim deed signed on January 25, 1991 and recorded on January 31, 1991 satisfied all the formal requirements for the transfer of Gordon's interest in the property to Georgina. The government argues that the deed is ineffective because there was no consideration given. That argument is beside the point. As long as the deed is executed and delivered, the transfer of the property is effective irrespective of the amount of consideration. Deeds are valid absent consideration when transferring property among family members or intended as gifts. *Straith v. Straith*, 355 Mich. 267, 276–77, 93 N.W.2d 893, 898 (1959); *Daane v. Lovell*, 83 Mich.App. 282, 292, 293, 268 N.W.2d 377, 382 (1978). The deed is sufficient to establish Georgina Porath's title to the "other half" of the property.

### C. Foreclosure Action: United States's Interest Via Tax Lien

■ Since the plaintiffs have made out a *prima facie* case, the burden shifts to the United States to prove the superiority of its interest in the property by virtue of its tax lien or otherwise. As noted earlier, a federal tax lien arises when unpaid taxes are assessed and continues until the resulting liability is either satisfied or becomes unenforceable due to the expiration of the statute of limitations. *See* 26 U.S.C. §§ 6321–6322; 26 C.F.R. § 301.6321–1. The lien attaches to all property and property rights that the taxpayer then holds or subsequently acquires. *Ibid.* Once a tax lien attaches to property, it remains with

the property despite subsequent transfers unless the property is sold to a *bona fide* purchaser for value before the notice of lien is filed. State law governs the determination of the nature of the legal interest that the taxpayer has in the property to which the lien attaches. *Nat'l Bank of Commerce*, 472 U.S. at 722, 105 S.Ct. 2919; *Aquilino v. United States*, 363 U.S. 509, 513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). Once the court determines the nature of the legal interest conferred by state law, the consequences are governed by federal law. *Nat'l Bank of Commerce*, 472 U.S. at 727, 105 S.Ct. 2919; *United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983).

 A tax lien does not attach to property that a taxpayer has transferred previously and that no longer belongs to him. However, when a taxpayer has fraudulently disposed of property prior to the establishment of a federal tax lien, the United States is entitled to rely upon the State's fraudulent conveyance laws where the property is located to determine whether the taxpayer has an interest in the property. *See e.g., Comm'r v. Stern*, 357 U.S. 39, 45–47, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958); *United States v. Fernon*, 640 F.2d 609, 611–12 (5th Cir.1981); *United States v. Kaplan*, 277 F.2d 405, 408 (5th Cir.1960). Thus, courts may look beyond nominal title to determine whether a taxpayer has retained an interest in the property.

 Similarly, where property is placed in the name of another as the taxpayer's *alter ego* or nominee, the lien attaches to the property. *See e.g. G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Lemaster v. United States*, 891 F.2d 115, 119 (6th Cir.1989). Therefore, the United States can enforce a taxpayer's liability for taxes against property held for him by his nominee. *Ibid; see also Porta–*

*John· of America, Inc. v. United States*, 4 F.Supp.2d 688, 689 (E.D.Mich.1998).

### 1. Fraudulent Conveyance

The governing statutory law of fraudulent conveyances in Michigan at the time of the real estate transfer in this case was Michigan Compiled Laws § 566.14, which defines constructive fraud, and Michigan Compiled Laws § 566.17, which defines actual fraud. These provisions were repealed in 1998 when Michigan adopted the Uniform Fraudulent Transfer Act, but the changes in the definitions of these terms are largely immaterial. *See* Mich. Comp. Laws §§ 566.34–.35; *In re Hurtado*, 342 F.3d 528, 532 n. 1 (6th Cir.2003).

 Under section 566.14, a transfer of property "by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation incurred without a fair consideration." Mich. Comp. Laws § 566.14 (1998). A transfer of property can also be fraudulent to the transferor's creditors if it is made "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." Mich. Comp. Laws § 566.17 (1998). Actual intent to hinder, delay, or defraud may be difficult to prove by direct evidence. Consequently, courts generally rely on the traditional "badges of fraud" to establish fraudulent intent. *See United States v. Leggett*, 292 F.2d 423, 426 (6th Cir.1961); *United States v. Rode*, 749 F.Supp. 1483, 1493 (W.D.Mich.1990), *aff'd* 943 F.2d 53 (6th Cir.1991) (unpublished).

 The "badges of fraud" have been found to include "inadequacy of consideration, secret or hurried transactions not in the usual mode of doing business, and the use of dummies or fictitious parties." *Leggett*, 292 F.2d at 427. Reservation of benefits, control or dominion of the

property by the debtor, insolvency of the debtor, and pendency or threat of litigation at the time of the transfer are other badges of fraud. *In re Otis & Edwards, P.C.*, 115 B.R. 900, 913 (Bankr.E.D.Mich. 1990). "A concurrence of several badges of fraud will always make out a strong case." *Leggett*, 292 F.2d at 427 (quoting *Timmer v. Pietrzyk*, 272 Mich. 238, 242, 261 N.W. 313, 314 (1935)). Transactions between family members affecting the rights of creditors are generally subjected to close scrutiny. *Kelley v. Thomas Solvent Co.*, 722 F.Supp. 1492, 1499 (W.D.Mich.1989) (citing *Linke v. Goodrich*, 30 Mich.App. 228, 186 N.W.2d 5 (1971)); *Bentley v. Caille*, 289 Mich. 74, 286 N.W. 163 (1939). These badges of fraud plus others identified by courts are now enumerated in the current Michigan statute. *See* Mich. Comp. Laws § 566.34(2) (listing as factors "[t]he transfer or obligation was to an insider"; "[t]he debtor retain[ing] possession or control of the property transferred after the transfer"; concealment of the transfer or obligation; actual or threatened litigation "[b]efore the transfer was made or obligation was incurred"; "[t]he transfer was of substantially all of the debtor's assets"; "[t]he debtor absconded"; "[t]he debtor removed or concealed assets"; "[t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred"; "[t]he transfer occurred shortly before or shortly after a substantial debt was incurred"; and "[t]he debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.")

When a conveyance or transfer of property is fraudulent as to a creditor, that creditor may "[h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim," or he may "[d]isregard the conveyance and attach or levy execution upon the property con-veyed." Mich. Comp. Laws § 566.19 (1998).

 The government contends that the conveyance of the Brighton property is fraudulent based on at least three separate statutory provisions. Under section 566.14, "every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Mich. Comp. Laws § 566.14; *see Foodland Distributors v. Al-Naimi*, 220 Mich.App. 453, 477, 559 N.W.2d 379, 389 (1996). A person is insolvent within the meaning of the act "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." Mich. Comp. Laws § 566.12. Under section 566.16, "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." Mich. Comp. Laws § 566.16; *see Foodland Distributors*, 220 Mich.App. at 478, 559 N.W.2d at 389–90. Finally, under section 566.17, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Mich. Comp. Laws § 566.17; *see also Foodland Distributors*, 220 Mich.App. at 478, 559 N.W.2d at 390.

 Under the first two sections, the government must show that Gordon Porath did not receive fair consideration for the transfer of his interest in the

Brighton property. It argues that the defendants should be bound by the recital on the deed that consideration was one dollar, and the legend that the transfer was exempt from transfer tax under Michigan Compiled Laws § 207.505(a), which exempts "instruments where the value of the consideration is less than $100.00." That argument is not persuasive. It is not unusual to recite nominal consideration in quit claim deeds transferring interests in property, especially among joint tenants. "While the consideration expressed in a written instrument is prima facie to be taken as the actual consideration, the rule is well settled by abundant authority that parol evidence is admissible to show that the true consideration was greater than or different from that expressed." *Stotts v. Stotts,* 198 Mich. 605, 617, 165 N.W. 761, 765 (1917). The evidence demonstrates that the transfer of Gordon's interest in the defendants' joint assets was part of his arrangement with Georgina to allow him to pursue a new business venture and allow her to remain secure in the marital home.

The government also argues that payment by means of the checks written from the defendants' joint money market account to U.S. Computers did not represent separate consideration from Georgina herself. That argument is based on the following premises: Gordon wrote the checks, which he had a right to do as a joint account holder; Georgina had separate accounts of her own, which she did not use to reflect payment for Gordon's interest in their joint assets; and Georgina generally did not manage the joint money market account. The government urges the Court to draw the inference that the checks totaling $65,000 really represent a joint investment by the Poraths in U.S. Computer Corporation.

That argument does not withstand the other evidence in the case. There can be no question that Georgina was strongly opposed to Gordon embarking on another business venture at age 67 and placing their savings and their property at risk. To suggest that Georgina would have joined in that venture flies in the face of the uncontradicted evidence of her expressed and documented opposition. Moreover, within three weeks of the July 9, 1987 agreement, Gordon loaned $65,000 from their joint account to U.S. Computer Corporation. As the Court understands the Poraths' agreement, Gordon was willing to put his assets at risk, but Georgina was not willing to act in kind. And the letter agreement of July 9, 1987 was intended to allow Georgina to put the parties joint assets in her name, beyond the reach of Gordon's creditors and future creditors. Based on the uncontested evidence of the valuation of the Poraths' joint assets at the time, $65,000 represented fair consideration for the privilege of making that transfer. Moreover, the agreement did not render Gordon insolvent in 1987 as he was embarking on his new venture, since he had assets of his own, and he still had an interest in his remaining half of the joint assets, which he apparently intended to spend on his business venture.

The Court concludes, therefore, that the government has not proved that Gordon Porath's transfer of his interest in the Brighton property in January 1991 was "made ... without a fair consideration," and therefore it has not established a fraudulent conveyance within the meaning of Michigan Compiled Laws § 566.14 or § 566.16.

The question remains whether the January 1991 transfer of Gordon's interest in the Brighton property ran afoul of Michigan Compiled Laws § 566.17. That statute is violated if the transfer was made with the actual intent "to hinder, delay, or defraud either present or future creditors." Mich. Comp. Laws § 566.17. Al-

though there is little evidence of an intent to hinder creditors when the agreement was made in July 1987, circumstances for the Poraths had changed dramatically by 1991. In the 1987 agreement, Gordon agreed with Georgina as follows: "whenever you desire you may transfer to yourself any and all assets that we hold jointly." That statement is somewhat illusory, at least as to the real estate, because Georgina could not transfer the house to herself without Gordon's cooperation by signing a deed. And there was no apparent need to effectuate a transfer of the house at the time. It served no practical purpose. Gordon continued to live in the house, and the it appears that the Poraths' day-to-day affairs remained as before the agreement was signed. Gordon did not actually transfer that interest until he had suffered his reversal of fortunes, at a time that he was, by his own admission, insolvent.

Gordon testified that he sought to effectuate the transfer of his interest in December 1990 when he got advice from "Carl," his former partner, to "register" the house to avoid complications with operating a commodities trading business from his home. He explained that both he and his wife had their own trading accounts, and they conducted a trading business by plotting commodity trades on a computer. That justification is unconvincing. The legalities of operating a business from a residence do not depend on the name of the record title holder, and according to Gordon's explanation, Georgina was trading in commodities on her own account as well. On the other hand, Gordon testified that he was aware of the tax liability resulting from U.S. Computers's failure to remit FICA payments, and it was a major concern to him. He had been interviewed on February 5, 1990 by an IRS revenue officer as part of a trust fund recovery penalty investigation. According to Gordon's letter to the IRS of December 9, 1991 (Pl.'s Ex. 2), he had dissipated the last of his personal assets in the summer of 1990. On this record, it is difficult to find a plausible explanation for Gordon transferring his interest in the Brighton property in January 1991 *other than* to place it beyond the reach of creditors, most notably the IRS.

The Court concludes that the transfer of Gordon's interest in the Brighton property in January 1991 was for the purpose of hindering the collection of the tax obligation by the IRS, and therefore the transfer violated Michigan Compiled Laws § 566.17.

### 2. Nominee Status

The government also contends that the transfer was a sham and Georgina held Gordon's one-half interest in the Brighton property as his nominee. In collecting tax liability, the United States can proceed not only against the taxpayer himself, but also against the taxpayer's nominee, instrumentality, or *alter ego*. *See Lemaster*, 891 F.2d at 119 & n. 3 (holding that it is proper for the United States to collect tax debts from assets held by the taxpayer's nominee). "A 'nominee' is a person or entity who holds legal title to property that in truth belongs to another who exercises control over and realizes the benefit of it." *Sumpter*, 302 F.Supp.2d at 720. "Nominee status is determined by the degree to which a party exercises control over an entity and its assets." *United States v. Bell*, 27 F.Supp.2d 1191, 1195 (E.D.Cal.1998) (citing *Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 729 (11th Cir.1989)).

A court presented with a nominee claim "attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." *In re Richards*, 231 B.R. 571, 578 (E.D.Pa.

1999). Another judge of this Court has succinctly summarized the six factors considered by courts in determining the claim:

(1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Porta–John of America Inc.*, 4 F.Supp.2d at 701 (citing *LiButti v. United States*, 968 F.Supp. 71, 76 (N.D.N.Y.1997), and *Towe Antique Ford Foundation v. IRS*, 791 F.Supp. 1450, 1454 (D.Mont.1992), *aff'd*, 999 F.2d 1387 (9th Cir.1993)); *see also LiButti v. United States*, 107 F.3d 110, 119–120 (2d Cir.1997). In *Spotts v. United States*, 429 F.3d 248 (6th Cir.2005), the Sixth Circuit stated that not all six factors are equally pertinent in every case, especially "in the context of a home purchase by a married couple because even if the home is only titled in one name, both ordinarily act as true owners." *Id.* at 253 n. 2. The court explained that "several of the factors used by courts will provide the same answer for every marital relationship in this context, thus providing little utility in distinguishing tax shams from legitimate titling decisions between spouses." *Ibid.* Although placing legal title to property in one's spouse's name where the spouse exercises no independent ownership rights may make the spouse a nominee, "it is frequently difficult to determine whether a wife has taken legal title as the nominee of her husband or whether she received the title in her own right as a gift." 2 Mertens Law of Fed. Income Taxation § 17:21 (2009).

The defendants testified that they intended the transfer of Gordon's interest in the Brighton property to be an actual transfer, and the evidence supports their position. As noted earlier, the transfer was pursuant to the earlier agreement, which itself was supported by adequate consideration. It is true that Gordon continued to live in the home and enjoy its benefits, paid no rent, and was not restricted to any particular rooms in the dwelling. However, one would expect such living arrangements between spouses. The defendants intended that title would pass to Georgina in her own right. The transaction in January 1991 may have been "fraudulent" within the meaning of Michigan Compiled Laws § 566.17, but it was not a sham.

The government has not established that Georgina held Gordon's interest in the marital premises as a nominee.

## V. Conclusion

Under Michigan law, when a conveyance is fraudulent it may be set aside as to a creditor "to the extent necessary to satisfy his claim," or the creditor may "[d]isregard the conveyance and attach or levy execution upon the property conveyed." Mich. Comp. Laws § 566.19 (1998). Consequently, the United States may look to Gordon Porath's interest in one-half of the Brighton property to satisfy its claim for unpaid taxes, although it may not invade Georgina's pre-existing share of the property. *See United States v. Craft*, 535 U.S. 274, 288, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (holding that a federal tax lien attaches to the delinquent taxpayer's interest in property held by the taxpayer and an innocent spouse by the entireties under 26 U.S.C. § 6321); *United States v. Rodgers*, 461 U.S. 677, 689–94, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) (holding that although 26 U.S.C. § 6321 allowed the government to force a sale of

jointly held homestead property to satisfy the tax obligation of one of the joint tenants, the government must take steps to compensate the nondelinquent spouse for her interest in the property); *United States v. Certain Real Property Located at 2525 Leroy Lane, West Bloomfield, Mich.,* 910 F.2d 343, 349 (6th Cir.1990) (acknowledging that the government could prosecute a forfeiture proceeding against property held by the entireties but providing that it would have a lien on the property only to the extent of the value of the wrongdoer's interest).

In this case, however, the government has taken the position that as long as the Poraths maintain the property, keep it insured, and pay the real estate taxes, the United States will not enforce a judgment of foreclosure while either Gordon or Georgina is living there. The Court finds that the transfer of Gordon's undivided one-half interest in the property located at 11000 East Grand River, Brighton, Michigan on January 25, 1991 was for the purpose of hindering the collection of a debt in violation of Michigan Compiled Laws § 566.17; therefore, the government may disregard the conveyance and levy on that property at the appropriate time, consistent with its forbearance agreement.

Accordingly, it is **ORDERED** that the defendants' motion for a jury trial [dkt. # 36] is **DENIED.**

It is further **ORDERED** that the defendants take nothing on their counterclaim, which is **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that judgment will enter in favor of the United States determining that a valid federal tax lien attaches to the interest of Gordon Porath in property commonly known as 11000 East Grand River, Brighton, Livingston County, Michigan. The United States may enforce its lien by foreclosure upon the termination of occupancy by Gordon Porath and Georgina Porath, or upon a default in the payment of property taxes on the premises, or the failure to maintain casualty insurance on the premises.