**UNITED STATES of America, Plaintiff,**

v.

**Edward J. HOLLAND, Jr., Edward Holland, L.P., the Royal Bank of Scotland, PLC, Frederick A. Patmon, Jr., as personal representative of the Estate of Frederick A. Patmon, Sr., and Peggy Young, as personal representative of the Estate of Hallison H. Young, Defendants.**

**CASE NO. 2:13–cv–10082–MOB–MKM**

United States District Court, E.D. Michigan, Southern Division.

Signed 09/12/2017

Edward J. Murphy, Stephen A. Sherman, James E. Brown, U.S. Department of Justice, Washington, DC, for Plaintiff.

Clarence B. Tucker, Sr., Clarence B. Tucker Sr., PLLC, Southfield, MI, Jason R. Hirsch, Morganroth & Morganroth, PLLC, Linda M. Watson, Birmingham, MI, Neal Nusholtz, Troy, MI, Gregory J. Fleesler, Lawrence Leo Ginsburg, Matthew Handler, Moses & Singer, LLP, New York, NY, Bertram L. Marks, Litigation Associates, Farmington Hills, MI, Avery K. Williams, Detroit, MI, for Defendants.

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

MARIANNE O. BATTANI, UNITED STATES DISTRICT JUDGE

This matter—involving five competing claims to an interpleader fund arising from the sale of a catalog of songs of which Edward Holland, Jr. was a co-author—is before the Court on motions for summary judgment filed by the United States of America ("US") (Doc. 239), the Royal Bank of Scotland ("RBS") (Doc. 224), the Estate

of Frederick A. Patmon, Sr. ("Patmon") (Doc. 291), and Edward J. Holland, Jr. ("Holland") and Edward Holland, L.P. ("EHLP") (Doc. 285). The Estate of Hallison H. Young ("Young") opposes the relief sought by the US, RBS, Holland and EHLP, but has not filed its own motion for summary judgment.

With the exception of Holland (who claims no right to the fund) and EHLP (which stipulates to being subordinate to RBS), each party seeks a first-priority distribution from the fund. As set forth below, RBS' claim is valid and superior to the competing claims, and its motion for summary judgment is **GRANTED**. In addition, because the US fails to demonstrate a viable basis for reaching the assets of EHLP, its motion for summary judgment is **DENIED**. Finally, because the claims of Patmon and Young remain pending in state court, Patmon's motion for summary judgment is **DENIED**, and Holland and EHLP's motion for summary judgment is **DENIED**.

## I. BACKGROUND

### A. Edward Holland, Jr.

Defendant Edward Holland, Jr. is a prolific songwriter who wrote (or co-wrote) several classic Motown compositions, including "Baby Love," "Stop in the Name of Love," and "Jimmy Mack." Through songwriter agreements with Jobete Music Company, Inc. ("Jobete/EMI") and Broadcast Music, Inc. ("BMI"), Holland owned rights to royalty payments accruing on these works (the "Royalty Assets").

The US seeks a judgment against Holland for his federal income tax liabilities for the years 1991–94, 1996–2004, 2006, and 2008–12. (Doc. 30). The US alleges that as of December 19, 2016 Holland owed a total balance of $19,982,932.46. (Doc. 239, p. 1).

### B. The 1998 Securitization Transaction and 2005 Refinance

In 1998, Holland retained the law firm Willkie Farr & Gallagher and the investment bank Fahnestock & Company to execute a transaction in which Holland would receive cash from the sale of securities backed by the Royalty Assets (the "1998 Transaction"). In order to "securitize" the Royalty Assets, Holland assigned his rights in the Royalty Assets to Edward Holland, L.P. ("EHLP"), which was a "special purpose vehicle" designed to "isolate [the Royalty Assets] from Mr. Holland's estate" in order to "maximize[ ] bankruptcy remoteness of those assets." Holland owned 99.75% of EHLP. The other 0.25% was held by Edward Holland Royalty Venture I SPC, Inc. ("EHRV"), which was at all relevant times owned entirely by Holland. (Doc. 224, pp. 3, 4).

Upon receiving the Royalty Assets from Holland, EHLP issued interest-bearing notes with a principal balance of $15,033,600 (the "Notes") and delivered the Notes to Bankers Trust Company ("BTC") to be sold to institutional investors. In addition, EHLP assigned the Royalty Assets to BTC and directed BMI and Jobete/EMI to make all royalty payments directly to BTC until the notes were repaid. (Doc. 239, p. 6). The Notes were sold to two insurance companies for face value, and approximately $8.4 million was remitted to Holland. An additional $1.7 million from the proceeds was deposited into an escrow account, which was then used to pay certain debts of Mr. Holland, including a payment of approximately $1.4 million to the IRS. (Doc. 224, pp. 4–6).

In 2005, EHLP and RBS entered into several interrelated agreements (the "2005 Transaction") in order to refinance the 1998 Transaction. RBS issued a loan to EHLP in the approximate amount of $14.6 million, and in exchange, EHLP assigned

the Royalty Assets to RBS and directed BMI and Jobete/EMI to make royalty payments directly to RBS. The RBS loan comprised both a "Term Facility" of $10,168,000 and a "Revolving Facility" which allowed EHLP to borrow an additional $4,452,000 via "Utilisation Requests." (Doc. 284, p. 3). From the Term Facility proceeds, $9,088,720.55 was used to pay off the 1998 Notes, and Holland netted an additional $1,073,573. (Doc. 239, p. 13). EHLP made Utilisation Requests of $175,000 in 2006, and two requests in 2007 of $500,000 and $3,609,000, respectively. (Doc. 239, Exs. 137, 138). Those payments were made to Edward Holland or companies he owned. (Doc. 284, p. 4). In January of 2014, counsel for RBS sent a Notice of Default to EHLP, seeking immediate payment of the outstanding balance of the loan, approximately $8 million. (Doc. 239, Ex. 116).

### C. Patmon and Young

Pursuant to 26 U.S.C. § 7403(b), the US added Defendants Frederick A. Patmon, Sr. (now Frederick A. Patmon, Jr., as personal representative of the Estate of Frederick A. Patmon, Sr.) ("Patmon") and Peggy Young, as the personal representative of the Estate of Hallison H. Young ("Young") because Patmon and Young purported to have rights to the Royalty Assets. Patmon and Young each claim to hold an attorneys' lien of approximately $3 million arising from their representation of Holland in lawsuits filed in Wayne County Circuit Court in 1988 (the "1988 Lawsuit") and 1992 (the "1992 Lawsuit"). Patmon and Young contend that their representation of Holland resulted in a 2004 settlement agreement between Holland and Berry Gordy that "created a pool of funds" to which their attorneys' liens attach. (Doc. 232, p. 7). Patmon and Young further assert that Holland has "surreptitiously hidden" these funds from Patmon and Young,

and that a constructive trust should be imposed over the assets of EHLP. (Id.).

In 2004, Patmon and Young filed a claim in Wayne County Circuit Court seeking unpaid attorneys' fees from Holland, EHLP, and other related entities. (Doc. 285, Ex. 1). Based on various theories including quantum meruit, breach of contract and constructive trust, Patmon and Young sought to recover the allegedly unpaid legal fees. In December of 2014, those claims partially survived the defendants' motions for summary disposition, with the Wayne County Circuit Court concluding that Patmon and Young "may pursue claims for constructive trust" and "may pursue attorneys' liens regarding Edward Holland's 1992 Wayne County Circuit Court case against Motown, Berry Gordy and their affiliates, if [Patmon and Young] can demonstrate that the subsequent loan was a fund of money derived from that litigation." (Doc. 285, Ex. 12). To date, those claims remain pending.

### D. The Interpleader Fund

On April 30, 2015, the Court permitted EHLP to sell the Royalty Assets to Round Hill Music Royalty Fund L.P. ("Round Hill") pursuant to the terms of an Asset Acquisition Agreement, on the condition that the sale proceeds, $21 million, would be paid to the Clerk of the United States District Court for the Eastern District of Michigan, for deposit into the registry of the Court and for interpleader pursuant to 28 U.S.C. § 1335. (Doc. 118).

## II. STANDARD OF REVIEW

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." State Farm Fire & Cas. Co. v. McGowan, 421 F.3d 433, 436 (6th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" Brown v. Scott, 329 F.Supp.2d 905, 910 (E.D. Mich. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. Anderson, 477 U.S. at 248, 106 S.Ct. 2505; McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 251, 106 S.Ct. 2505.

## III. ANALYSIS

### A. US Claim

The US divides its motion for summary judgment into three main arguments: (i) that Holland is liable for federal income taxes, (ii) that EHLP holds the Royalty Assets as Holland's nominee, fraudulent transferee, and/or alter ego, and (iii) that the US' tax liens take priority over the claims of RBS, Patmon and Young. While the Parties devote no small amount of briefing to the first and third arguments, the second issue proves to be dispositive in this case. As discussed below, Holland's transfer of the Royalty Assets to EHLP did not significantly hinder creditors, and for that reason the Court cannot disregard Holland's assignment of the Royalty Assets to EHLP.

### 1. Choice of Law

The Parties dispute whether Holland has any remaining interest in the Royalty Assets. Whether a taxpayer has "'property' or 'rights to property' to which [a] tax lien could attach" is a matter of state law. Aquilino v. U.S., 363 U.S. 509, 512–13, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). See United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985) ("[I]n application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.") (internal citations omitted). Once state law determines that a property interest exists, federal law dictates the tax consequences. Drye v. United States, 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999) ("[One] look[s] to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as property or rights to property within the compass of federal tax lien legislation.").

As discussed more fully below, there is no need for this Court to determine which state law applies to the US' third-party-liability theories, as that analysis would have no impact on the ultimate determination. See Tech. for Energy Corp. v. Scandpower, A/S, 880 F.2d 875, 877 (6th Cir. 1989) ("[The district court] concluded defendants would prevail under either state's law, [and so] the Court deemed it unnecessary to solve the choice of law puzzle. . . . Like the District Court, we find it unnecessary to reach the choice-of-law question.").

### 2. Theories of Third–Party Liability

In order to enforce Holland's tax debts against the Royalty Assets, which are held by EHLP, the US raises three theories of third-party liability: (i) that EHLP held title to the Royalty Assets as Holland's nominee, (ii) that Holland fraudulently conveyed the Royalty Assets to EHLP, and (iii) that EHLP is the alter ego of Holland.

With respect to the nominee theory, the US cites a Sixth Circuit case, Spotts v. United States, 429 F.3d 248 (6th Cir. 2005), in which the court noted that

[m]any courts use six factors in evaluating nominee questions: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

Spotts, 429 F.3d at 253 (citing Porta–John of America, Inc. v. United States, 4 F.Supp.2d 688, 701 (E.D.Mich.1998)).

Regarding the fraudulent-transfer theory, the US asserts that the Porta–John factors "largely overlap with the 'badges of fraud' that courts look to in deciding whether to void a transfer for actual fraud under Michigan's Uniform Fraudulent Conveyance Act (MUFCA), MCL § 566.11 et. seq." (Doc. 310, p. 4 (citing United States v. Porath, 764 F.Supp.2d 883, 889 (E.D. Mich. 2011))).

Finally, as to the alter-ego theory, the US submits that Michigan courts frequently cite a three-part test for corporate veil piercing as follows: (i) the corporate entity was a mere instrumentality of another entity or individual; (ii) the corporate entity was used to commit a fraud or wrong; and, (iii) the plaintiff suffered an unjust loss. (Doc. 239, p. 24 (citing Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd., 475 F.3d 783, 798 (6th Cir. 2007))).

The Court appreciates that these doctrines have distinct elements and independent theoretical foundations. Under the circumstances of this case, however, each theory requires the Court to consider similar factual considerations, and, ultimately, to determine whether the securitization transactions at issue result in a "wrong" that the law should refuse to uphold.

### 3. Application

The US asserts that Holland transferred the Royalty Assets to EHLP with the goal of hindering creditors. (Doc. 310, p. 11). In addressing the merits of this contention, the Court has considered each of the multi-factor tests referenced above. While certain factors favor the US' position—for example, on May 6, 1998, the IRS sent Holland a notice that it believed he owed additional income tax liabilities for tax years 1991–94 totaling $3,895,788.53 (Doc. 239, Ex. 16)—the most significant factor in this case is whether Holland received adequate consideration for the transfer to EHLP. As discussed

more fully below, Holland received adequate consideration, and his creditors were no worse off because of the 1998 and 2005 Transactions.

In analyzing whether Holland received full consideration for transferring the Royalty Assets to EHLP, a step-by-step review of the 1998 Transaction is informative. In the first stage, prior to the 1998 Transaction, Holland held the Royalty Assets, the approximate market value of which was $23 million. (Doc. 224, Ex. 7). In the second stage, Holland transferred the Royalty Assets to EHLP, thereby making EHLP worth approximately $23 million. (Doc. 293, Ex. 3, p. 54). "In return" for transferring the Royalty Assets to EHLP, Holland received 99.75% ownership in EHLP, with the other 0.25% held by EHRV, which in turn was owned by Holland. (Doc. 239, ¶¶ 12–13). Because Holland owned EHLP, his net worth was not affected by transferring the Royalty Assets to EHLP. In the third stage, EHLP issued Notes with a principal balance of $15,033,600. Although the issuance of the Notes decreased EHLP's interest in the Royalty Assets by the amount of the notes, EHLP received the proceeds of the sale, and its overall value was not affected. In the final stage, EHLP distributed the proceeds (i) to Holland's creditors, (ii) to bankers and lawyers involved in the 1998 Transaction, and (iii) to Holland. (Doc. 224, p. 6). While this distribution decreased the value of Holland's shares in EHLP, Holland received cash in the amount of the decrease (with the exception of the transaction fees and payments to creditors). Accordingly, when the dust settled on the 1998 Transaction, Holland was no worse off. Perhaps more significantly, neither were his creditors.

The US contests this characterization, contending that, when compared to the prospect of garnishing the Royalty Assets, the 1998 Transaction left Holland's creditors with "the far less appealing recourse of seizing [Holland's] partnership interest (which is subject to major partnership-level debts)." (Doc. 310, p. 7). In this connection, the US asserts that "a conveyance is not an exchange for equivalent value when it makes the debtor 'execution proof.'" (Id.). In support, the US cites Interpool Ltd. v. Patterson, 890 F.Supp. 259 (S.D.N.Y. 1995), in which a debtor-husband transferred assets to a partnership jointly owned by his wife, and Dunn v. Minnema, 323 Mich. 687, 36 N.W.2d 182, 184 (1949), in which a debtor-husband "invest[ed] of $9,600 of his personal assets in property to which he and his wife held title by the entireties."

Under the particular facts of this case, the transfer to EHLP did not make Holland "execution proof" because, unlike the debtors at issue in Interpool and Dunn, Holland was the sole owner of the assignee entity, EHLP. Accordingly, seizing Holland's partnership shares would, apparently, enable a creditor to reach the Royalty Assets. The US is correct that, under this scenario, the Royalty Assets would be subject to "partnership-level debts." However, because Holland received the benefit of such partnership-level debts in the form of the Note proceeds, this factor is of no avail to the US. If Holland had simply left the Note proceeds in his bank account, his creditors would have been no worse off— they could garnish the cash and recover the remaining value of the Royalty Assets upon repayment of the Notes.

In view of these factors, the 1998 Transaction and 2005 Transaction did not significantly hinder Holland's creditors. Accordingly, the transfer did not result in the type of "wrong" that would support a finding that (i) that EHLP held title to the Royalty Assets as Holland's nominee, (ii) that Holland fraudulently conveyed the Royalty Assets to EHLP, or (iii) that

EHLP is the alter ego of Holland. Because the US demonstrates no basis for attaching property held by EHLP, the Court must deny its motion for summary judgment.

## B. Patmon and Young Claims (and Holland Defenses)

Patmon and Young contend that Holland owes them each approximately $3 million in legal fees incurred in connection with the 1988 Lawsuit and the 1992 Lawsuit. Patmon and Young contend that they are entitled to a "charging lien" over Holland's recovery from a 2004 settlement agreement between Holland and Berry Gordy, which resolved the 1988 Lawsuit and 1992 Lawsuit. Although Patmon and Young acknowledge that the 2004 settlement agreement does not expressly provide for any monetary payment to Holland, they contend that Gordy made a sham loan (the "Gordy Loan") to Holland of approximately $3 million in order to settle Holland's claims. Accordingly, Patmon and Young assert that they hold a charging lien over the proceeds of the sham loan. Finally, Patmon and Young contend that Holland has fraudulently concealed his recovery under the 2004 settlement, and request the Wayne County Circuit Court to impose a constructive trust over the Royalty Assets.

As discussed below, Patmon and Young lack a present right to the Royalty Assets, and fail to establish any basis on which their claims could take priority over RBS. Patmon and Young make three major arguments in support of their claims: (i) that their claims take priority by virtue of an assignment contained in the Capital Contribution Agreement between Holland and EHLP, (ii) that they hold state-law charging liens over the Royalty Assets, and (iii) that they are entitled to a constructive trust over the Royalty Assets. The Court will discuss these theories in turn below.

■ Regarding the purported assignment, the following excerpted language makes clear that any "carve out" for Patmon and Young was limited to royalties earned prior to the date of the Capital Contribution Agreement, May 1, 1998:

From and after the Closing Date, the sole and exclusive right throughout the world and the universe to receive and collect any and all Gross Receipts regardless of when earned (except that any monetary damages, verdict awards, settlements or other compensation relating to royalties earned prior to the Closing Date and resulting from ongoing litigation involving (a) Edward J. Holland, Jr. v. Jobete Music Company, Inc., et al. (Case No. 88-815355-CK (Michigan Court of Appeals)) and (b) Edward J. Holland, Jr. v. The Gordy Company, f/k/a Motown Record Corporation, et al. (Case No. 92-233-992-CK (Circuit Court for County of Wayne)) shall be exempted from this Agreement and related agreements and such damages, awards, settlements or other compensation shall be paid directly to the plaintiff and plaintiff's counsel in the aforementioned litigation) and payable and accruing under the Contract Assets before or after the date of this Agreement, that are paid on or after the Closing Date[.]

(Doc. 224, Ex. 7 (emphasis added)). As the Royalty Assets at issue in this case derive from the value of royalties earned after the 2013 Round Hill sale, the "carve out" offers no relief to Patmon and young.

The assertion that Patmon and Young have charging liens over the Royalty Assets is demonstrably false, and has been rejected by the Wayne County Circuit Court. In support of their claims, Patmon and Young appeal to the transcript of a December 15, 2014 motion hearing before Judge Robert Ziolkowski as providing that Patmon and Young "have a charging lien

for the work that they did." (See, e.g., Doc.296, p. 5). However, Judge Ziolkowski's ruling—which is substantially less decisive than Patmon and Young's characterization—was subsequently memorialized in an order dated April 9, 2015, providing in pertinent part as follows: "[Patmon and Young] may pursue attorneys' liens regarding Edward Holland's 1992 Wayne County Circuit Court case against Motown, Berry Gordy and their affiliates, if Plaintiffs can demonstrate that the subsequent loan [i.e., the Gordy Loan] was a fund of money derived from that litigation." (Doc. 285, Ex. 12). As this order makes clear that any charging liens relate to the Gordy Loan, as opposed to the Royalty Assets, Patmon and Young have no charging lien over the Royalty Assets. This seems to be the only logical result under Michigan law, as the Royalty Assets cannot reasonably be considered a "judgment or recovery" of the 1988 Lawsuit or the 1992 Lawsuit. See Kysor Industrial Corp. v. D.M. Liquidating Co., 11 Mich. App. 438, 444, 161 N.W.2d 452 (Mich. 1968).

Finally, it remains to be determined by the Wayne County Circuit Court whether Patmon and Young have a constructive trust over the Royalty Assets. (See Doc. 285, Ex. 12 (providing that Patmon and Young "may pursue claims for constructive trust")). However, even if the Wayne County Circuit Court rules in favor of Patmon and Young, "a constructive trust does not arise until a judicial decision imposes such a trust under Michigan law." Blachy v. Butcher, 221 F.3d 896, 905 (6th Cir. 2000). Accordingly, Patmon and Young's constructive-trust rights, if any, would be junior to RBS' claim.

For these reasons, the Court must deny Patmon's motion for summary judgment. Moreover, because the merits of Patmon and Young's state-law claims remain to be determined in Wayne County Circuit Court, the Court also must deny Holland and EHLP's motion for summary judgment.

### C. RBS Claim

For the reasons addressed above, the US has no right to the Royalty Assets, and Patmon and Young's constructive-trust rights, if any, would be subordinate to RBS' claim. Under the terms of the 2005 Transaction, RBS issued to EHLP an interest-bearing loan in the amount of approximately $14.6 million. (Doc. 224, Ex. 20). As part of the 2005 Transaction, EHLP assigned the Royalty Assets to RBS and directed BMI and Jobete/EMI to pay RBS directly. (Doc. 224, Exs. 21, 22). The Court has entered a stipulated judgment against EHLP, and in favor of RBS, in the principal amount of $7,271,775.92, together with interest through April 30, 2016 in the amount of $1,059,462.77, totaling $8,331,238.69, plus costs (including reasonable legal fees) and disbursements in amounts to be determined. (Doc. 196). Accordingly, RBS' claim is valid, and RBS is entitled to a first-priority distribution from the Royalty Assets.

### D. Ancillary Motions

In connection with the present motions for summary judgment, the Parties filed several procedural motions, which will be resolved below.

RBS' motion to strike Patmon's response to RBS' reply (Doc. 275) is **GRANTED.** As noted by RBS, Rule 7.1(c)(3) of the Local Rules of the United States District Court for the Eastern District of Michigan provides that "[a] party must obtain leave of court to file more than one response to a motion for summary judgment." As Patmon did not obtain leave to file a second response to RBS' motion for summary judgment, the second

response (Doc. 279) shall be stricken from the record.

Patmon's motion to amend its motion for summary judgment in order to eliminate language seeking to incorporate by reference a prior brief (Doc. 297) is **GRANTED**. The relevant language in Patmon's motion for summary judgment (Doc. 291, p. 5) is stricken.

 Patmon's motion for leave to file under seal the "In-camera Affidavit of Jean Bronson" (Doc. 308) is **DENIED**. The Court denied Patmon's previous motion to seal this affidavit (Doc. 304) because Patmon failed to advance any reasoning in support of the request to seal. (Doc. 306). The renewed motion adds only that the affidavit contains "private information that should remain confidential." Unlike information merely exchanged between the parties, "[t]he public has a strong interest in obtaining the information contained in the court record." Brown & Williamson Tobacco Corp. v. F.T.C., 710 F.2d 1165, 1180 (6th Cir. 1983). "Only the most compelling reasons can justify non-disclosure of judicial records." In re Knoxville News–Sentinel Co., 723 F.2d 470, 476 (6th Cir. 1983). Even where a party can show a compelling reason why certain documents or portions thereof should be sealed, the seal itself must be narrowly tailored to serve that reason. Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan, 825 F.3d 299, 305 (6th Cir. 2016). Under this authority, Patmon fails to demonstrate a compelling reason why the affidavit should be sealed.

Finally, RBS' motion to strike portions of the US' consolidated reply brief (Doc. 312) is **DENIED**. RBS' assertion that certain portions of the US' reply are "actually a sur-reply to RBS' motion for summary judgment," is misplaced under the circumstances. Because the parties' requests for priority are mutually exclusive, the US' motion for summary judgment necessarily includes arguments that respond to RBS' motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, RBS' motion for summary judgment (Doc. 224) is **GRANTED**, the US' motion for summary judgment (Doc. 239) is **DENIED**, Holland and EHLP's motion for summary judgment (Doc. 285) is **DENIED**, and Patmon's motion for summary judgment (Doc. 291) is **DENIED**.

In addition, RBS' motion to strike Patmon's response to RBS' reply (Doc. 275) is **GRANTED**, Patmon's motion to amend (Doc. 297) is **GRANTED**, Patmon's motion to file under seal the "In-camera Affidavit of Jean Bronson" (Doc. 308) is **DENIED**, and RBS' motion to strike portions of the US' consolidated reply brief (Doc. 312) is **DENIED**.

**IT IS SO ORDERED.**